**No. 19-4550 (L)**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**UNITED STATES OF AMERICA**,

*Appellee,*

v.

**MICHAEL MISELIS, et al.,**

*Appellants.*

On Appeal from the United States District Court
for the Western District of Virginia
Charlottesville Division (Hon. Norman K. Moon)

**BRIEF OF THE APPELLANTS**

**JUVAL O. SCOTT**
Federal Public Defender
  for the Western District of Virginia

**LISA M. LORISH**
Assistant Federal Public Defender
401 E. Market Street, Suite 106
Charlottesville, VA  22902
(434) 220-3380

*Counsel for Appellant Daley*

**RAYMOND C. TARLTON**
TARLTON | POLK PLLC
3905 Haworth Drive, Suite 207 (27609)
PO Box 1386 (27602)
Raleigh, NC
(919) 948-6464

*Counsel for Appellant Miselis*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................ii

STATEMENT OF JURISDICTION ....................................................................1

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ...............................2

STATUTORY BACKGROUND ..........................................................................3

STATEMENT OF THE CASE ............................................................................5

SUMMARY OF ARGUMENT ...........................................................................8

ARGUMENT ...................................................................................................10

    I.    The Anti-Riot Act is unconstitutionally overbroad because it regulates
        a substantial amount of Constitutionally-protected speech and assembly ........10

        A.  The Anti-Riot Act regulates protected speech because it fails to
            meet the Constitutional requirements for incitement .....................................11

        B.  The amount of protected speech regulated by the Anti-Riot Act is
            substantial.......................................................................................................23

    II.   The Anti-Riot Act is unconstitutionally vague........................................................27

        A.  Vague laws violate due process and the separation of powers ......................28

        B.  The definition of riot is unconstitutionally vague.........................................29

        C.  The terms "incite," "organize," "promote," "encourage," "participate
            in," or "carry on" a riot are unconstitutionally vague ..................................34

        D.  The overt act requirement lacks any temporal tie to the Commerce
            Event, and includes attempts to perform "any other" overt act "for
            any purpose specified" as a riot-related activity creating two more
            sources of vagueness .......................................................................................37

        E.  Vagueness concerns are heightened where constitutionally-
            protected speech is at stake.............................................................................38

i

CONCLUSION .................................................................................................................38

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### Cases

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ........................................ 9, 10

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ...............................................*passim*

*Carter v. United States*, 417 F.2d 384 (9th Cir. 1969) .............................................5

*City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ....................................23

*City of Chicago v. Morales*, 527 U.S. 41 (1999)........................................................29

*Coates v. Cincinnati*, 402 U.S. 611 (1971) ...............................................................25

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926) ..................................................28

*Dakota Rural Action, et al. v. Noem,* 5:19-cv-05026 (Sept., 18, 2019) ................................35

*Dennis v. United States*, 341 U.S. 494 (1951) ....................................................... 16, 24

*Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C.*, 518 U.S. 727 (1996) ...................15

*Doe v. Cooper*, 842 F.3d 833 (4th Cir. 2016) ..........................................................32

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) .................................23

*Frohwerk v. United States*, 249 U.S. 204 (1919) .....................................................24

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ...............................................................8

*Gitlow v. People of State of New York*, 268 U.S. 652 (1925)....................................36

*Greer v. Spock*, 424 U.S. 828 (1976) .......................................................................15

*Hess v. Indiana*, 414 U.S. 105 (1973).........................................................12, 19, 20

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ....................... 10, 38

*Houston v. Hill*, 482 U.S. 451(1987) ...................................................................24

*In re Shead*, 302 F. Supp. 560 (N.D. Cal. 1969) .......................................... 5, 19

*Johnson v. United States*, 135 S. Ct. 2551 (2015) .........................................30, 32, 34

*Kolender v. Lawson*, 461 U.S. 352 (1983) .........................................................29

*Landmark Comms., Inc. v. Virginia*, 435 U.S. 829 (1978) .........................................16, 31, 32

*Landry v. Daley*, 280 F. Supp. 968 (N.D.Ill. 1968) ...............................................30

*Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003) ....................................................36

*Manning v. Caldwell for City of Roanoke*, 930 F.3d 264 (4th Cir. 2019) ...............................36

*N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ......................................... 9, 22

*Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*,
   411 F.2d 934 (7th Cir. 1969) ...............................................................5

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ..................................................8

*Noto v. United States*, 367 U.S. 290 (1961) .......................................................12

*Pennekamp v. Florida*, 328 U.S. 331 (1946) ......................................................32

*Schenck v. United States*, 249 U.S. 47 (1919) ................................................. 16, 24

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .....................................................28

*United States v. Armel*, 585 F.3d 182 (4th Cir. 2009) ............................................15

*United States v. Davis*, 139 S. Ct. 2319 (2019) ..................................................28

*United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972) ......................................*passim*

*United States v. Hoffman*, 334 F. Supp. 504 (D.D.C. Nov. 23, 1971) ...............................5

*United States v. Simms*, 914 F.3d 229 (4th Cir. 2019).............................................29

*United States v. Williams*, 553 U.S. 285 (2008) .................................................. 10, 23, 34, 38

*Virginia v. Hicks*, 539 U.S. 113 (2003) ....................................................................11

*Whitney v. Calif.*, 274 U.S. 357 (1927) ....................................................................24

## **Statutes**

18 U.S.C. § 231 ..............................................................................1, 4-5, 14, 19

18 U.S.C. § 232 ..........................................................................................14

18 U.S.C § 922 ..............................................................................................1

18 U.S.C. § 2101 ...................................................................................*passim*

18 U.S.C. § 2102 ...................................................................................*passim*

18 U.S.C § 3231 ............................................................................................1

18 U.S.C § 3742 ............................................................................................1

Conn. Gen. Stat. § 53a-179b(a) (2012) ....................................................................31

## **Other Authorities**

*Declaration of Independence* (US 1776) ....................................................................26

*The Federal Riot Act and the First Amendment,* 5 Harv. C.R.-C.L. L. Rev 393 (1970)........22

*The Federal Anti-Riot Act and Political Crime: The Need for Criminal Law Theory*, 20 Villanova L. Rev. 897 (1975) ..............................................................................22

No. 19-4551(L)

_____

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

UNITED STATES OF AMERICA,
*Appellee,*

v.

MICHAEL MISELIS, et al,
*Appellants.*
_____

On Appeal from the United States District Court
for the Western District of Virginia
Charlottesville Division (Hon. Norman K. Moon)
_____

**BRIEF OF THE APPELLANTS**
_____

**STATEMENT OF JURISDICTION**

The district court had jurisdiction over these criminal prosecutions under 18

U.S.C. §§ 922, 3231.  The district court sentenced the Appellants on July 19, 2019 and

entered final judgments on July 26, 2019.  JA 545; 552.  The Appellants timely

appealed and this Court consolidated their cases.  JA 559; 561.  This Court has

jurisdiction under 18 U.S.C. § 3742 over this timely appeal from a final order.

## <u>STATEMENT OF THE ISSUE PRESENTED FOR REVIEW</u>

The Appellants were prosecuted under the Federal Anti-Riot Act, 18 U.S.C. § 2101, an infrequently used statute that was passed in 1968 at the height of concerns over protests related to the Vietnam War and the civil rights movement. The Seventh Circuit is the only Circuit Court of Appeals to ever consider the constitutionality of the statute. That court vacated the convictions of the "Chicago Seven" who were protesters at the Democratic National Convention, but narrowly (2-1) upheld the constitutionality of the Anti-Riot Act, by rewriting it entirely. *United States v. Dellinger*, 472 F.2d 340, 359 (7th Cir. 1972).

The Appellants in this case were part of the Rise Above Movement ("RAM"), and self-identify as white nationalists. Other members of RAM were prosecuted simultaneously in the Central District of California, also under the Anti-Riot Act. The district court below denied the Appellants' motions to dismiss the indictment on the grounds that the Anti-Riot Act is facially unconstitutional, while the district court judge in the Central District of California declared the statute unconstitutional and dismissed the cases. This appeal presents two issues—

1)     Does the Anti-Riot Act regulate a substantial amount of Constitutionally-protected speech and assembly such that it is unconstitutionally overbroad.

2)     Is the Anti-Riot Act void for vagueness.

## STATUTORY BACKGROUND

*The Anti-Riot Act, 18 U.S.C. § 2101(a)*

> (a)  Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent—
>
>> (1) to incite a riot; or
>>
>> (2) to organize, promote, encourage, participate in, or carry on a riot; or
>>
>> (3) to commit any act of violence in furtherance of a riot; or
>>
>> (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;
>
> and who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in subparagraph (A), (B), (C), or (D) of this paragraph—
>
> Shall be fined under this title, or imprisoned not more than five years, or both.

In short, the Anti-Riot act criminalizes:

- Engaging in a **Commerce Event** – either travel in, or use of a facility of commerce

- With the **Intent** to Engage in **Riot-Related Activities** (subsections (1)-(4)) – an intent that must exist at the time of the Commerce Event

- Where there is an **Actual or Attempted Overt Act** – which may occur at any time during or after the Commerce Event, and must be for any purpose specified as **Riot-Related Activities** (subsections (1)-(4))

The Anti-Riot Act also contains additional relevant subparagraphs:

> (b)  In any prosecution under this section, proof that a defendant engaged or attempted to engage in one or more of the overt acts described in subparagraph (A), (B), (C), or (D) of paragraph (1) of subsection (a) and (1) has traveled in interstate or foreign commerce, or (2) has use of or used any facility of

3

interstate or foreign commerce, including but not limited to, mail, telegraph, telephone, radio, or television, to communicate with or broadcast to any person or group of persons prior to such overt acts, such travel or use shall be admissible proof to establish that such defendant traveled in or used such facility of interstate or foreign commerce.

. . .

(e)   Nothing contained in this section shall be construed to make it unlawful for any person to travel in, or use any facility of, interstate or foreign commerce for the purpose of pursuing the legitimate objectives of organized labor, through orderly and lawful means.

Finally, 18 U.S.C. § 2102 sets out Definitions:

(a)  As used in this chapter, the term "riot" means a public disturbance involving (1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual or (2) a threat or threats of the commission of an act or acts of violence by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability of immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individual.

(b)  As used in this chapter, the term "to incite a riot", or "to organize, promote, encourage, participate in, or carry on a riot", includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts.

*Statutory History*

Congress enacted the Anti-Riot Act as a rider bill to the Civil Rights Act of

1968 at the height of public advocacy over civil rights and the Vietnam War.  The

4

same bill contained another law prohibiting Civil Disorders, now codified as 18 U.S.C.

§ 231.  Between 1968 and 2018, there have been only four reported cases that discuss

the Anti-Riot Act in any detail, three that are related to the Chicago Seven who were

prosecuted for their participation in a protest of the 1968 Democratic National

Convention, and the fourth in response to a declaratory judgment action brought by

the Black Liberation Movement in 1969.  *See Dellinger*, 472 F.2d 340 (overturning

convictions of the Chicago Seven while upholding constitutionality of the act 2-1);

*Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 938 (7th Cir.

1969) (declaratory judgment about Anti-Riot Act in proceeding related to *Dellinger*);

*United States v. Hoffman*, 334 F. Supp. 504, 509 (D.D.C. Nov. 23, 1971) (affirming

constitutionality of act in ruling on motion for disclosure of records of electronic

surveillance about one member of the Chicago Seven); and *In re Shead*, 302 F. Supp.

560, 565 (N.D. Cal. 1969) (upholding constitutionality of act in declaratory judgment

brought by Black Liberation Movement), *aff'd on other grounds* in *Carter v. United States*,

417 F.2d 384 (9th Cir. 1969) (finding plaintiffs had no standing to challenge

constitutionality of the law).

## STATEMENT OF THE CASE

The Appellants were arrested on October 2, 2018, on criminal complaints out

of the Western District of Virginia alleging a violation of the Federal Anti-Riot Act,

18 U.S.C. § 2101, and conspiracy to violate the same.  JA 5; 19; 44.  An indictment

with the same two counts followed on October 10, 2018.  JA 68.  The Appellants

5

both pled guilty to Count One of the indictment, conspiracy to violate the Anti-Riot Act, and the government dismissed Count Two in each case. JA 238; 250. In written plea agreements, both Appellants reserved their right to appeal the constitutionality of the Anti-Riot Act. *Id.*[1]

Less than two weeks after the Appellants were arrested, four other men were arrested on a criminal complaint filed in the Central District of California, alleging the same two offenses. *See United States v. Rundo, et al*, No. 2:18-cr-759 ("Rundo"). The California defendants, and the Appellants, were all alleged to be members of RAM who had travelled to political rallies.

> Throughout 2017, the defendants and other RAM members traveled to political rallies, including in Huntington Beach, California on March 25, 2017, Berkeley, California on April 15, 2017, San Bernardino, California on June 10, 2017, and Charlottesville, Virginia on August 11-12, 2017. RAM members violently attacked and assaulted counter-protestors at each of these events.

Rundo Complaint (ECF #1) at ¶ 5.

> From in or about March 2017, to in or about August 2017, RAM and its members and associates, including the defendants, [Appellants] and [other defendants], traveled to multiple political rallies and organized demonstrations in California and Virginia, where they prepared to and engaged in acts of violence against numerous individuals.

JA 69-70.

---

[1] Two other defendants were prosecuted in the Western District of Virginia. One pled guilty early without challenging the constitutionality of the Anti-Riot Act and is yet to be sentenced. The other, Mr. Gillen, has a separate appeal pending. *United States v. Gillen*, No. 19-4553.

The Federal Anti-Riot Act requires that a defendant either travel in interstate commerce or use a facility of interstate or foreign commerce with the requisite intent. 18 U.S.C. § 2101. The RAM members who travelled to Charlottesville, Virginia, to participate in the Unite the Right Rally on August 12, 2017, were indicted in the Western District of Virginia alleging their travel from California to Virginia as the Commerce Event for Count Two, the Anti-Riot Act count. JA 73-74. Their participation in the prior California rallies was included as relevant overt acts to Count One, the Conspiracy count. JA 70-71. The RAM members who did not attend the Unite the Right Rally were instead indicted in the Central District of California, alleging their use of the facilities of interstate commerce (the Internet, telephone, and a credit card) as the Commerce Event for Count Two, the Anti-Riot Act count. (Rundo ECF #47). Their participation in prior California rallies and the organization's participation in the Charlottesville Unite the Right Rally were included as overt acts to Count One, the Conspiracy count. *Id.*

The cases proceeded simultaneously. The Appellants filed motions to dismiss the indictment in February of 2019 arguing that the Anti-Riot Act was facially unconstitutional and that the Indictment had not sufficiently pled the charge in any event. JA 75; 101. A similar motion was filed in the California case on April 22, 2019, (Rundo ECF #134) the same day that the district court below held argument on the motions to dismiss (JA 156). Three days later the district court below entered an order denying the motions. JA 195. On May 2, 2019, a memorandum opinion was

7

issued explaining the district court's order and conclusion that the Anti-Riot Act was constitutional.  JA 196.

On June 3, 2019, the California case was dismissed after district court Judge Carney reached the opposite conclusion, finding that the Anti-Riot Act was facially unconstitutional because it regulated a substantial amount of Constitutionally-protected speech and assembly and as such was overbroad.  Rundo ECF # 145.

The Appellants were sentenced on July 19, 2019—Mr. Daley to 37 months and Mr. Miselis to 27 months.  JA 545; 552.   Each Appellant timely noticed their appeal. JA 559; 561.  This Court consolidated the appeals.

## SUMMARY OF ARGUMENT

The Anti-Riot Act is unconstitutional because it is both overbroad and vague. The vagueness problem contributes to the overbreadth problem, but also stands as a separate and independent constitutional issue.  At its core, the First Amendment protects impassioned speech—particularly on issues of public debate.  Indeed, full-throated speech is of great value to our democracy, and is especially important in the realm of political advocacy.  This nation has a "profound national commitment to the principle that debate on public issues"—including politics and competing worldviews—"should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

This guarantee is so important that it covers inflammatory, racist, and offensive speech. "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) (emphasis added). As a result, the First Amendment protects words and expression that may encourage or promote violence, as long as they fall short of incitement to violence. In fact, the Supreme Court "has made clear . . . that mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927 (1982).

To distinguish between *advocacy* of violence, and *incitement* of violence, the Supreme Court has explained that the speaker, or actor, must have the intent to cause violence, that the risk of violence must be imminent, and that violence must be likely to actually occur. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Hess v. Indiana*, 414 U.S. 105 (1973). In contrast, the Anti-Riot Act punishes speech and expression without requiring intent, imminence, or likelihood. And the reach is sweeping, stretching back to the intention in a speaker's mind that may come weeks, or months before any "riot" (that need not ever occur). For these simple reasons, the Court must find the statute unconstitutional on its face.

The Anti-Riot Act is also unconstitutionally vague. The overbreadth of the statute amplifies the vagueness, and the vagueness contributes to the overbreadth. The significance of the government's resurrection of this law from the archives will extend beyond the members of RAM the government has chosen to prosecute in this

case—indeed similar state laws have recently been used to target anti-pipeline protesters in South Dakota and political protesters at the 2018 Presidential inauguration, without much success to date.  Left to stand, the Anti-Riot Act will chill legitimate speech and expression which is a "vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002).

## ARGUMENT

### I.    The Anti-Riot Act is unconstitutionally overbroad because it regulates a substantial amount of Constitutionally-protected speech and assembly.

The Anti-Riot Act is unconstitutionally overbroad because it regulates Constitutionally-protected speech, and not just in a few hypothetical applications of the statute.  In this law, Congress criminalized much more than rioting.  And much more than attempting to riot, or even intending to riot.  Instead, Congress extended criminal consequences to speech and expression far removed from violence.  Numerous sources of vagueness within the statute are set forth below as separate constitutional defects.  In addition, these ambiguities contribute to the unconstitutional overbreadth because a statute is overbroad when "it is unclear" whether it regulates a substantial amount of speech.  *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 and nn. 6-7 (1982).  First Amendment concerns are heightened in a case—such as this one—where "the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citation omitted).

10

A. <u>The Anti-Riot Act regulates protected speech because it fails to meet the Constitutional requirements for incitement.</u>

Congress passed the Anti-Riot Act in 1968, a year before the Supreme Court's decision in *Brandenburg* that sets out the test this Court must apply to determine whether the statute regulates a substantial amount of protected speech. 395 U.S. at 447. In *Brandenburg*, the leader of a Ku Klux Klan group was convicted under an Ohio syndicalism statute for "advocate(ing). . . the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform" and for "voluntarily assembl(ing) with any society, group, or assemblage of persons formed to teach or advocate the doctrines of criminal syndicalism." *Id.* In setting forth the constitutional infirmity of this Ohio statute, the Court explained the history of First Amendment jurisprudence as setting forth "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447. The Court affirmed that "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Id.* at 448 (quoting *Noto v.*

11

*United States*, 367 U.S. 290, 297-98 (1961)).[2]  A few years later, the Supreme Court

clarified that to be classified as incitement, the speech must also be uttered with the

specific intent "to produce . . . imminent disorder." *Hess*, 414 U.S. at 109-10

(overturning conviction where there "was no evidence or rational inference from the

import of the language, that his words were intended to produce, and likely to

produce, imminent disorder" and that a "tendency to lead to violence" was not

enough).

Like the statute considered in *Brandenburg*, the Anti-Riot Act "sweeps within its

condemnation speech which our Constitution has immunized from government

control." *See id.* at 448.  Attempting to curb public disturbances during

demonstrations, the Anti-Riot Act engulfs a broad swath of behavior, including mere

advocacy of force or violence, and does not require incitement to imminent lawless

action.  Indeed, the law lacks any requirement that the regulated expression be

constrained to imminent lawless action, or that the expression be likely to incite or

---

[2] As set forth below, Congresses' flawed attempt in in 18 U.S.C. § 2102(b), one year
before *Brandenburg* was decided, to carve out a safe harbor for speech protected by the
First Amendment in the Anti-Riot Act runs directly afoul of *Brandenburg*'s protection
of speech and advocacy calling for or teaching the propriety of the use of force or
violence:

> …the term "to incite a riot"…shall not be deemed to mean the mere oral or
> written (1) advocacy of ideas or (2) expression of belief, *not involving advocacy of
> any act or acts of violence or assertion of the rightness of, or the right to commit*, any such
> act or acts.

(emphasis added).

produce such action.  Instead, the Anti-Riot Act, like the Ohio Criminal Syndicalism statute, punishes the mere advocacy of violence.  Worse still, the law punishes the use of commerce with the intent to merely advocate for violence, whether or not any violence ever occurs.  And criminal liability can hinge not on the actions of the speaker, but on how others react—potentially long after the Commerce Event.

    1. *The law does not require that imminent violence follow the regulated speech or expression.*

By punishing someone for engaging in a Commerce Event with the intent to carry out a prohibited Riot-Related Activity, instead of punishing Riot-Related Activities themselves, the statute immediately introduces a level of abstraction from any potential violence.  As an initial matter, every court to interpret the statute has agreed that *no riot need ever occur* for criminal liability to attach.  This, alone, calls into question whether the regulated speech is appropriately tied to imminent violent action.  Because criminal liability does not depend on the actual occurrence of a riot, the statute does not require a causal relationship between the speech and ensuing violence which is the linchpin of *Bradenburg*'s imminence requirement.

The heart of the Anti-Riot Act is still the "riot" that need not ever occur.  And a riot is defined as a "public disturbance" involving

        "an act or acts of violence" by one or more persons "part of an assemblage of three or more persons" which act or acts shall constitute a "clear and present danger" of, or shall result in, damage or injury to property or person; (hereinafter the "Actual Violence Prong") or

        "a threat or threats of the commission of an act or acts of violence by one or more persons . . . having, individually or collectively, the ability of

13

immediate execution of such threats, where the performance of the
threatened act or acts of violence would constitute a clear and present
danger of, or would result in damage or injury" to property or person.
(hereinafter the "Threatened Violence Prong").

18 U.S.C. § 2102(a). The Anti-Riot Act, and this definition of "riot" was passed by

Congress in the same bill that included another new law punishing Civil Disorders,

codified as 18 U.S.C. §§ 231-32. In contrast to the sprawling definition of riot,

Congress limited the definition of "civil disorder" to

[A]ny public disturbance involving acts of violence by assemblages of three or
more persons, which causes an immediate danger of or results in damage or
injury to the property or person of any other individual.

18 U.S.C. § 232. The definition of "civil disorder" shows that Congress knew how to

include an imminence requirement—"which causes an immediate danger of or results

in damage or injury."

However, instead of basing the Anti-Riot Act on imminent danger, Congress

intended that the "riot" at the center of the Anti-Riot Act be much broader in two

critical ways. First, by including the Threatened Violence Prong which does not

require that any violence take place, and second, by including actual and threatened

acts of violence constituting a "clear and present danger" instead of "an immediate

danger." And the Threatened Violence prong falls short of the requirements for what

must count as a "true threat." To determine whether a statement is a "true threat,"

and therefore language unprotected by the First Amendment, this Court employs an

objective test to determine if "an ordinary reasonable recipient who is familiar with

14

the context … would interpret [the statement] as a threat of injury'" that is lacking in the statute. *United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009).

On this second point, the Anti-Riot Act is the only federal criminal statute that uses the phrase "clear and present danger" which is a broader concept than one limited to acts intended to result in immediate violence that are also likely to result in immediate violence.

While the majority opinion in *Brandenburg* did not expressly abolish the "clear and present danger" doctrine, it did not use the phrase at all, instead replacing it with the familiar test today: intent, imminence, and likelihood of violence. Neither did the majority opinion cite to the doctrine in any way, and two concurring Justices expressly advocated that "clear and present danger" be removed from the interpretation of the First Amendment. 395 U.S. at 449-53 (Black, J. and Douglas, J. concurring). Since *Brandenburg*, no majority opinion from the Supreme Court has relied upon "clear and present danger" as the relevant test, and instead, later cases recognized that "clear and present danger . . . evolved into the modern incitement rule of *Brandenburg v. Ohio . . .*" *Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C.*, 518 U.S. 727 (1996) (Souter, J. concurrence); *Greer v. Spock*, 424 U.S. 828, 863 (1976) ("[t]his Court long ago departed from 'clear and present danger' as a test for limiting free expression") (Brennan, J. and Marshall, J. dissenting).

The "clear and present danger" test was clearly abandoned. Prior to this change in the law, however, Congress used this language in the Anti-Riot Act. And as

a matter of statutory construction, this Court should give the words the meaning they had when the text was adopted. At the time the text was adopted, the "clear and present danger" test instructed courts to evaluate a "question of proximity and degree" and measure the gravity of harm against the likelihood of its occurring. *Schenck v. United States*, 249 U.S. 47 (1919); *Dennis v. United States*, 341 U.S. 494 (1951). Fundamentally, "clear and present danger" language "requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow form the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Landmark Comms., Inc. v. Virginia*, 435 U.S. 829, 842-43 (1978) (overturning decision of Virginia Supreme Court that relied on "clear and present danger" test to determine whether the rights of the press were unconstitutionally abridged by a statute that required confidentiality with respect to judicial inquiry commissions). The unconstitutional vagueness concerns implicit in this balancing test are discussed *infra*, but critically, there is simply no imminence requirement inherent to this analysis. For this reason alone, the Court should find that the mere definition of "riot" fails to meet the incitement requirements necessary to regulate speech and expression. Afterall, "clear and present danger" was "never intended to express a technical legal doctrine or to convey a formula for adjudicating cases." *Landmark Comms*, 435 U.S. at 842 (internal quotation omitted).

16

The fact that the definition of "riot"—which is central to the Anti-Riot Act—fails to meet the *Brandenburg* requirement is one thing. But added to this is the fact that the Anti-Riot Act does not require any Riot-Related Activity ever occur, instead, just that the accused "engaged or attempted to engage" in "any overt act for any purpose specified" as a Riot-Related Activity. The Seventh Circuit rewrote this particular aspect of the statute entirely by concluding that what Congress meant to say was anyone who participates in a Commerce Event, intending to commit a Riot-Related Activity, who actually commits that Riot-Related Activity, has violated the law. *Dellinger*, 472 F.2d at 361. And the Seventh Circuit did so consciously, and in recognition that without this redrafting of the statute, the law would not survive an overbreadth challenge. *Id.* at 362 ("If we could be persuaded that the overt act…could be a speech which only was a step toward one of the elements of (A)-(D), taking those merely as goals, we would be unable to conclude that the statute required an adequate relation between such speech and actions").

This Court should read the statute as it is actually drafted. The Anti-Riot Act requires a Commerce Event, with the requisite intent, and then "any other overt act" for "any purpose specified" as a Riot-Related Activity. Critically, the statute describes the Riot-Related Activities as "overt acts" in 18 U.S.C. § 2101(b). Therefore, the language "any other overt act" requires an interpretation that gives meaning to the words "any" and "other." In sum, Congress could have said that the Anti-Riot Act required as an element that: who either during the course of any such travel or use or

17

thereafter performs any of the overt acts specified in subparagraphs (A), (B), (C), or (D). But they did not. Instead, a violation of the Anti-Riot Act is complete upon the actual or attempted overt act, made to further the encouraging or promoting of a riot, that need never occur.[3]

Finally, in the spirit of interpreting the statute as Congress actually wrote it, this Court need look no farther than the text of 18 U.S.C. § 2102(b) to confirm that the statute criminalizes mere advocacy, not imminent incitement. Instead of defining any of the Riot-Related Activities, this part of the statute explains that these terms "include[] but [are] not limited to, urging or instigating other persons to riot, *but shall not* be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, *not involving* advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts." 18 U.S.C. § 2102(b) (emphasis added). "A true negation of a negation is an affirmation, and a careful exclusion from an exclusion is at least likely to result in an inclusion." *Dellinger*, 472 F.2d at 363. Therefore, read literally, the statute includes "punishment for *mere* oral or

---

[3] Examples of the problem are easy to illustrate. Someone uses commerce by purchasing a plane ticket with the intent to travel to another city to join a violent protest of the police, and then starts driving to the airport. Whether the flight is delayed and she misses the protest, or if the violence never actually happens, she could be prosecuted under the law. The same fate for someone who uses commerce to purchase a computer with the intention of starting a group that will promote South Carolina seceding from the United States, using any means necessary, and then sends an email advocating for the same to all of his friends.

18

written advocacy of an act of violence or assertion of the rightness of an act of

violence. . . " *Id.* To avoid concluding that "the drafters of the double negative

intended to make mere advocacy an offense," which "would render the statute

invalid" the Seventh Circuit assumed that Congress intended the opposite of what it

said, and that prosecutors could be trusted to reach the same conclusion. *Id.* at 364

("any possibility that prosecution would be undertaken in reliance" on the

construction as drafted was "minimal"); *see also In re Shead*, 302 F. Supp. 560, 566

(N.D. Cal. 1969). The *Dellinger* court did not hide the fact that there was no support

from the legislative history or the text of the statute to support this reading. *Id.* at

363.

Of course, if Congress intended to carve-out mere advocacy of violence, it

would have said so directly. The Anti-Riot Act was passed in 1968, before the

Supreme Court held implicitly in *Brandenburg*, 395 U.S. at 447-48, and explicitly in *Hess*,

414 at 108-09 that the mere advocacy of violence is protected speech. Again,

contrasting the Anti-Riot Act with the Civil Disorder law passed at the same time is

instructive. The Civil Disorder law prohibits someone from teaching or

demonstrating any technique capable of causing injury to someone, knowing or

intending that the technique would be used in furtherance of a civil disorder. 18

U.S.C. § 231. This comparatively narrow statute essentially proscribes teaching

someone how to use violence while intending or knowing violence would occur at a

public disturbance of three of more people that involved acts of violence causing

19

"immediate danger."  The Anti-Riot Act in comparison, covers so much protected speech and expression that Congress, confronted with this overbreadth, had to explicitly say that "[n]othing contained in this section shall be construed to make it unlawful for any person to travel in, or use any facility of, interstate or foreign commerce for the purpose of pursuing the legitimate objectives of organized labor, through orderly and lawful means."  18 U.S.C. § 2101.  But attempting to carve out only labor union strikes from the reach of the Act fails to adequately safeguard the vast sphere of speech and expressive conduct the First Amendment protects.

   2.  *The Anti-Riot Act does not require that criminal intent coexist with any act of violence, lacks a specific intent requirement.*

   In addition to its imminence problem, the Anti-Riot Act has an intent problem. To satisfy the standard for incitement, expressive conduct must be uttered with the specific intent "to produce . . . imminent disorder."  *Hess*, 414 U.S. at 109-10.  In contrast, the Anti-Riot Act punishes anyone who travels or uses a facility of interstate commerce with intent to engage in Riot-Related Activities and who also "thereafter performs or attempts to perform any other overt act" as discussed above. 18 U.S.C. § 2101(a) (emphasis added).  There is "no required causal relationship between the travel with intent and the riot actually incited" and "[n]o necessary connection whatsoever need be shown between them nor is there any time limitation as to when the overt act shall take place with relationship to the travel." *Dellinger*, 472 F.2d at 414 (Pell, J., dissenting).  The result is that a defendant may be punished "at the federal

20

level for what would otherwise be a local crime because at some time in his past he had crossed a state line or had used a facility of interstate commerce with nefarious intent." *Id.*

This temporal attenuation is exacerbated because the Anti-Riot Act lacks the traditional Due Process requirement for a concurrence of *mens rea* (guilty mind) and *actus reus* (bad act). The required criminal intent must only exist at the moment of travel, or when the email was sent, or credit card used (the Commerce Event). There is no intent requirement at the time of the later Actual or Attempted Overt Act. The result is that the statute allows the requisite criminal intent to be frozen at the moment of interstate travel or use of commerce, and that this is sufficient to infect any subsequent actions that could be committed without the specific criminal intent. As such, "[t]he bare convergence of evil intent and subsequent disorder can make acts of protected expression criminal." Kaufman, Henry R., *The Federal Riot Act and the First Amendment*, 5 Harv. C.R.-C.L. L. Rev 393 (1970).

This was a problem recognized at the time the law was passed. The breadth of the Act arising out of this particular flaw was pointed out by Representative Emanuel Celler, Chairman of the House Judiciary Committee at the time of the statute's enactment:

> The bill violates the due process clause in providing that intent and act do not coincide. The bill makes it a crime for an individual to cross a State line or to go from a foreign country to a State or to mail a letter with a certain intent to incite or encourage a riot. Afterward, even though he no longer has that same

intent, if he commits some overt act that could be construed as encouraging or promoting a riot or other public disturbance, he will have violated the law, although his crossing of the State line may have occurred months or even years before. This violates a basic requirement of criminal law that the intent and the criminal act must be contemporaneous. It is clear the bill does not require any specific intent at the time of the overt act—only at the time of the crossing of the State line. How could a jury possibly establish this intent unrelated to a contemporaneous act is impossible to fathom.

113 CONG. REC. 19373 (1967) (remarks of Representative Emanuel Celler); *see also* Zalman, Marvin, The Federal Anti-Riot Act and Political Crime: The Need for Criminal Law Theory, 20 Villanova L. Rev. 897, 920 (1975).

But more troubling, the Anti-Riot Act punishes a speaker for creating a likelihood of a threat of conduct that in turn creates a risk or danger of harm. This scheme creates an attenuation problem that punishes speech and expressive conduct when the harm threatened is not imminent and is remote from the speech itself. This same attenuation problem doomed the boycott law at issue in *Claiborne Hardware Co.*. 458 U.S. at 928-29. A speech using "strong language" promoting boycotts during the Civil Rights era was constitutionally-protected because the violence stemming from that speech occurred "weeks or months later." 458 U.S. at 928-29. And this attenuation was relevant in *Brandenburg* as well, with the Supreme Court finding that the activist's speech was protected partly because the actual acts of violence occurred weeks or months later. *Id.*

The results is simply that the criminal intent is not sufficiently tied to any later actual or threatened force or violence.

B. <u>The amount of protected speech regulated by the Anti-Riot Act is
substantial.</u>

The Anti-Riot Act is so overbroad and so immediately tied to First
Amendment expression that there is a "realistic danger that the statute itself will
significantly compromise recognized First Amendment protections of parties not
before the Court for it to be facially challenged on overbreadth grounds." *City Council
v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984); *see also Williams*, 553 U.S. at 303.

In assessing the risk of a statute compromising recognized First Amendment
protections, this Court can consider the history of the Government's
"implementation" of the statute in evaluating this facial challenge. *Forsyth County v.
Nationalist Movement*, 505 U.S. 123, 131(1992). And that history is constitutionally
dubious: while most recently the Anti-Riot Act has been wielded against members of
RAM, the Anti-Riot Act was passed in 1968 as part of the Civil Rights Act to give the
federal government a "tool" to "reign in" protests against the Vietnam War and
demonstrations that were a part of the civil rights movement for African Americans.
In addition to the infamous "Chicago Seven" prosecution, members of the Black
Liberation Movement were subpoenaed to testify before a grand jury for the
Northern District of California relating to alleged violations of the law.

What is more, the "clear and present" danger language at the center of the
definition of "riot" was used to punish the following conduct, before it was
abandoned in *Brandenburg*:

23

- a protester who distributed pamphlets urging resistance to the draft and impugning the motives of those backing World War I. *Schenck v. United States*, 249 U.S. 47 (1919);

- someone who published articles critical of the war effort in World War I. *Frohwerk v. United States*, 249 U.S. 204 (1919);

- advocating, teaching, or aiding and abetting the commission of crime, sabotage, or unlawful acts of force and violence as a means of accomplishing political change. *Whitney v. Calif.*, 274 U.S. 357 (1927), overturned by *Bradenburg*, 395 U.S. at 448-49; and

- conspiracy to organize the Communist Party of the United States as a group to teach and advocate the overthrow of the Government by force. *Dennis,* 341 U.S. 494.

The Anti-Riot Act plainly "operates in an area where there is substantial potential for abridgment of expression." *Dellinger*, 472 F.2d at 355-56 ("We do not pretend to minimize the first amendment problems presented on the face of this statute"). Overbreadth is established by showing a significant number of situations where a law could impair or restrict constitutionally protected speech. The plain language of the law can conceivably be violated by people on a regular basis, but only some people—those chosen by law enforcement in their discretion—are arrested. *See Houston v. Hill*, 482 U.S. 451, 466-67 (1987) (invalidating ordinance that criminalized interrupting police officers in performance of their duties because instead of providing the "breathing space" that "First Amendment freedoms need to survive," that ordinance could regularly be applied to protected expression). The persistence of electronic communication and ease with which individuals can communicate

24

controversial positions through email, and social media, significantly expands the chilling umbrella of the Anti-Riot Act.

Furthermore, the Supreme Court has found sweeping breadth when a law attempts to predicate exposure to criminal punishment on how onlookers or other people will react to the speech or conduct, especially in the context of political demonstrations. In *Coates v. Cincinnati*, the Supreme Court invalidated on both vagueness and overbreadth grounds an ordinance that criminalized "three or more persons to assemble…on any of the sidewalks…and there conduct themselves in a manner annoying to persons passing by." 402 U.S. 611, 614 (1971). This law was held to be unconstitutionally overbroad in that political demonstrations would be criminalized if spectators or onlookers found them to annoying. *Id.*

The Anti-Riot Act triggers the same constitutional infirmity. It criminalizes speech and expressive conduct—in part—communicated by people who have, or may, assemble, even in traditional public forums, based on how onlookers, spectators, counter-protestors, or other people present may react, or ultimately do react, thereby infringing and placing a chill effect on political demonstrations, a sphere at the core of First Amendment protections.

But what is more, it criminalizes activities an *additional* step away from actual violent or assaultive conduct by punishing travel or the use of interstate facilities with *intent* to incite, promote, or encourage a riot. The attenuated nexus between intent and harm means there is no fair warning and no clearly discernable standard to draw

25

the line between lawful and felonious behavior, creating due process concerns. It would mean that the speaker in *Brandenburg* could not be punished for advocating for violence, but he could be punished for traveling across state lines with the intent to advocate for violence.

The sweep and breadth of the Anti-Riot Act, with contours so elastic the content is rendered devoid of any discernible standard, is simply alarming. Under the Anti-Riot Act, a speaker must avoid inflammatory words—conceivably connected to a Commerce Event—no matter how far removed from a potential "riot," or speak at his peril. The danger of such a regime is clear: the statute creates a significant chilling effect based on fear of a potential listener's reaction, and increases the opportunities for arbitrary and capricious enforcement and selective prosecution based on hostility toward the most politically unpopular groups in any given moment.[4]

---

[4] Without a doubt, numerous historical figures argued for revolution would fall under the Anti-Riot Act's prescriptions. For example, Thomas Jefferson, whose advocacy inspired far more than a public disturbance.

> When in the Course of human events, it becomes necessary for one people to *dissolve* the political bands which have connected them with another…That whenever any Form of Government becomes destructive of these ends [life, liberty, and the pursuit of happiness], it is the Right of the People to *alter or to abolish it*, and to institute new Government…under absolute Despotism, it is their right, it is their duty, to *throw off* such Government, and to provide new Guards for their future security.

*See generally* Declaration of Independence (US 1776) (emphasis added)

## II.    The Anti-Riot Act is unconstitutionally vague.

The Anti-Riot Act does not criminalize rioting. Instead, it makes behavior far-removed from engaging in an actual riot a federal crime. Pervasive ambiguities in each aspect of this complicated statute—and critically within the very definition of "riot" itself—converge to result in a statute that does not provide guidance to an ordinary person about what is, and is not, a federal crime. And this vagueness has allowed unelected prosecutors and judges to define what counts as criminal behavior, instead of the legislature. The dearth of prosecutions under this statute in the 50 years of its mostly quiet existence proves the point.

The definition of riot is essential to every other part of the statute. There can be no Riot-Related Activities without understanding what a riot is. And since a riot need not ever occur under the law, there can certainly not be an *intent* to engage in Riot-Related Activities without a clear definition of riot. More removed still, there can be no use of commerce with the requisite intent.

As set forth below, the definition of riot is itself unconstitutionally vague. Layered onto this uncertainty, the Riot-Related Activities each depend upon the vague term riot, but are also replete with other ambiguous words such as "incite," "organize," "promote," "encourage," "participate in," or "carry on." None of these terms are sufficiently defined to give notice of what is prohibited. Finally, the attenuation between the intent required at the time of the Commerce Event, and the

27

later Actual or Attempted Overt Act, which can occur at any later point in time, creates a separate, final source of vagueness.

Each of these sources of vagueness would be sufficient on its own to declare the statute unconstitutional. Combined, they render the statute incomprehensible. Therefore, this Court must resist "fashion[ing] a new, clearer law to take its place" and instead "treat the law as a nullity and invite Congress to try again." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).

A. Vague laws violate due process and the separation of powers.

"[A] vague law is no law at all." *Davis*, 139 S. Ct. at 2323. The well-established doctrine prohibiting enforcement of vague laws "rests on the twin constitutional pillars of due process and separation of powers." *Id.* citing *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212-13 (2018) (plurality opinion). The due process concern is that the "'first essential of due process of law' [is] that statutes must give people 'of common intelligence' fair notice of what the law demands of them." *Davis*, 139 S. Ct. at 2325 quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926). The separation of powers problem arises because only Congress has the "power to write new federal criminal laws" but a vague law means "unelected prosecutors and judges" instead of the legislature take "responsibility for defining criminal behavior." *Id.* The result is a law that leaves the people "no sure way to know what consequences will attach to their conduct." *Id.* at 232. As a result, they are subject to the potential of "the arbitrary

28

deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (citing

*Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

To sum up, the void-for-vagueness doctrine "ensures citizens have fair notice

of prohibited conduct, guards against discriminatory enforcement of ambiguous laws,

and respects the foundational principle that only Congress-not the executive or the

courts-is empowered to establish the bounds of proscribed conduct." *United States v.*

*Simms*, 914 F.3d 229, 234 (4th Cir. 2019) (*en banc*).

B.  The definition of riot is unconstitutionally vague.

While many federal criminal statutes include definitions for unclear words and

phrases, the Anti-Riot Act defines only one word – riot.  But this definition creates

more questions than it answers.  The definition of riot requires a "public disturbance"

involving either

> "an act or acts of violence" by one or more persons "part of an assemblage of
> three or more persons" which act or acts shall constitute a "clear and present
> danger" of, or shall result in, damage or injury to property or person (the
> "Actual Violence Prong");

> or "a threat or threats of the commission of an act or acts of violence by one or
> more persons . . . having, individually or collectively, the ability of immediate
> execution of such threats, where the performance of the threatened act or acts
> of violence would constitute a clear and present danger of, or would result in
> damage or injury" to property or person (the "Threatened Violence Prong").

18 U.S.C. § 2102 (a).

Three separate sources of vagueness are baked into this definition.  First, what

qualifies as a "public disturbance" – a threshold requirement.  Second, when does an

act constitute a "clear and present danger." Third, what determines when "one or more persons" has "individually or collectively, the ability of immediate execution" of a threatened act.

*First*, the statute does not define "public disturbance." In his partial dissent in *Dellinger*, Judge Pell called attention to the dangerous imprecision of the word "disturbance" noting that "[n]ew ideas more often than not create disturbances, yet the very purpose of the First Amendment is to stimulate the creation and dissemination of new concepts." 472 F.2d at 415 quoting *Landry v. Daley*, 280 F.Supp. 968, 971 (N.D.Ill. 1968). But more recently still, the Supreme Court expressed the same concern in examining the Connecticut statute that criminalizes "rioting at a correctional institution." *Johnson v. United States*, 135 S. Ct. 2551, 2560 (2015).

In *Johnson*, the Government argued that otherwise vague language describing the offenses that qualified as Armed Career Criminal Act ("ACCA") predicates under the statutes' residual clause could be salvaged if there were sufficient "straightforward" examples of conduct that always qualified. One of the examples the government offered as straightforward was the Connecticut offense of "rioting at a correctional institution." *Id.* at 2560 (internal citation omitted). The Supreme Court explained that upon first reflection "[t]hat certainly sounds like a violent felony—until one realizes that Connecticut defines this offense to include taking part in 'any disorder, disturbance, strike, riot or other organized disobedience to the rules and

30

regulations' of the prison." *Id.* citing Conn. Gen. Stat. § 53a-179b(a) (2012). The Court then raised the concern that:

> Who is to say which the ordinary "disorder" most closely resembles—a full-fledged prison riot, a food-fight in the prison cafeteria, or a "passive and nonviolent [act] such as disregarding an order to move.

*Id.* (internal citation omitted). Without a public disturbance, there can be no riot, and the term disturbance is plainly ambiguous.[5]

*Second*, both the Actual Violence Prong, and the Threatened Violence Prong require the judgment that an act or threatened act (if carried out) "constitute a clear and present danger of, or shall result in," damage or injury to property or person. As set forth above, the "clear and present danger" test requires a court to evaluate "proximity and degree" and measure gravities of harm and likelihoods of occurrence. Indeed, "clear and present danger" language "requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Landmark Comms. Inc.*, 435 U.S. at 842-

---

[5] A contemporary situation illustrates the problem. Recently during a Democratic presidential primary debate, a candidate announced that, if elected, he would ban all AR-15 assault rifles. Nearly immediately, an elected representative used the Internet to access Twitter and publicly "tweet at" that person in response—"My AR is ready for you Robert Francis." The result was public uproar with 60,000 other users "liking" this tweet, and more than 10,000 reposting it with comments either in support of the sentiment, or in indignation over such a threat. Congress passed the Anti-Riot Act without anticipating the frequency of public disturbances enabled by the Internet. *See, e.g.,* https://thehill.com/homenews/campaign/461267-twitter-takes-down-texas-gop-lawmakers-ar-tweet-about-orourke (last accessed Sept. 30, 2019)

43. And this language (which, again, does not appear in any other federal criminal statute) "was never intended 'to express a technical legal doctrine or to convey a formula for adjudicating cases.'" *Id.* at 842 (quoting *Pennekamp v. Florida*, 328 U.S. 331, 353 (1946) (Frankfurter, J., concurring)).

How, then, can the ordinary person know whether an act constitutes a "clear and present danger" of harm? Or can the ordinary person anticipate if a threatened act would be a "clear and present danger" of harm – if the act was taken to completion? Or if their speech will be so persuasive that someone in a group will be inspired to make such a threat? The case law tells the ordinary person that there is no technical formula and that they must instead balance the "character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Landmark Comms.* 435 U.S. at 842-43. This abstract measuring of harms is plagued by the same uncertainty that doomed the phrase "serious potential risk" in the ACCA residual clause. *See Johnson*, 135 S. Ct. 2560. Just as a district court was left without guidance about "how to measure the risk posed by a crime" and "indeterminacy about how much risk it takes for the crime to qualify," the definition of riot does not tell the ordinary person (or ordinary district court judge) whether an act or threatened act qualifies. *See also Doe v. Cooper*, 842 F.3d 833 (4th Cir. 2016) (North Carolina statute prohibiting registered sex offenders from being "at any place where minors gather for regularly scheduled educational, recreational, or social programs" unconstitutionally

vague because there was no way to determine whether a program was regularly scheduled, and how many minors must gather at the place).

*Third*, in the case of the riot definition's Threatened Act Prong, the statute adds the requirement that one or more of the people assembled in the public disturbance have the "ability of immediate execution of such threat or threats."  Again, determining whether one or more people possesses the ability to immediately execute a threat may certainly be clear in some cases – like if someone with a loaded firearm threatened to shoot someone.  But if someone did not have a loaded firearm and expressed that he was so angry he was going to kill someone, the statute provides no guidance for how to determine whether that person has the ability to immediately execute that threat or not.  Maybe the speaker would need to be really large?  Or look really intimidating?  Have a past history of violent actions?  To further complicate matters, the statute does not ask whether the *defendant* charged with violating the Anti-Riot Act had the ability to immediately execute a threat of violence.  Instead, the analysis may often be hypothetical.  Did the imagined public disturbance at the time the defendant engaged in a Commerce Event involve an individual with the ability to immediately execute a threat of violence.

In sum, the definition calls for an abstract assessment of chance: whether the person or group threatening the commission of an act of violence are *capable* of carrying out the threat, and *how quickly* the person or group could carry out the threat.  Said another way, the definition of "riot" requires a court to assess whether a threat of

violence contains a "serious potential risk" of harm.  And for the same reasons the

ACCA residual clause was unconstitutionally vague because it left "grave uncertainty

about how to estimate the risk posed by a crime" as well as "uncertainty about how

much risk it takes for a crime to qualify…," *Johnson*, 135 S. Ct. 2557-58, this statute

fails as well.  For this reason, the definition of riot is unconstitutionally vague,

invalidating the entire statute.

*     *     *     *

These three sources of ambiguity permit "wholly subjective judgments without

statutory definitions, narrowing context, or settled legal meaning." *Williams*, 553 U.S.

at 306.

C.  <u>The terms "incite," "organize," "promote," "encourage," "participate in," or "carry on" a riot are unconstitutionally vague.</u>

The ambiguities within the definition of riot are compounded by the fact that

no riot need ever occur for someone to be convicted under the Anti-Riot Act.

Instead the Riot-Related Activities that form the backbone of the statute include

inciting, organizing, promoting, encouraging, participating in, or carrying on in a

riot—or aiding and abetting any person in the same.

The Seventh Circuit openly admitted that these terms needed greater specificity

to avoid a vagueness problem. *Dellinger*, 472 F.2d at 361.  The court found that while

"incite," "participate in," "carry on," and "aid and abet" appear on their face to be

linked to some action, the terms "to organize, promote, encourage" are less clear. *Id.*

34

Yet because § 2102(b) states that "'to organize, promote, encourage, participate in, or carry on a riot,' includes, but is not limited to, urging or instigating other persons to act" the Seventh Circuit found that all of the Riot-Related Activities involved "urging or instigating," to remove the vagueness (and related overbreadth concerns). *See id.* at 362.

This approach contradicts the statute's plain language that the list of terms included, but *was not limited to*, urging or instigating. Interpreting the terms "organize," "promote," and "encourage" to all mean "urge" renders the specific inclusion of these other words as mere surplusage. A district court in South Dakota very recently reached a similar conclusion finding that a newly-passed state Riot-Boosting Act was likely unconstitutional. In particular, the terms "advis[ing], encourage[ing] and solicit[ing]" a riot were "passive" terms that did not "involve the direction or control of an activity that results in the use of force or violence" and "involve expressive activity of many kinds" and as a result were unconstitutionally vague. Order granting Injunctive and Declaratory Relief, *Dakota Rural Action, et al v. Noem*, 5:19-cv-05026, ECF # 50 (September 18, 2019).

This Court should read the terms organize, promote, and encourage with the plain meaning that persons of ordinary intelligence would assign to those terms, and the chilling effect that would follow. The result is significant ambiguity. Does "encouraging a riot" include telling someone that they are oppressed, or openly expressing anti-Semitic, racist, or xenophobic views? If the Act protects the right to

35

advocate for anger at social conditions and government policies, it apparently does so only when the speaker can ensure that the audience will not interpret such anger as a direct call to action. That is, the distinction between legal and illegal conduct depends on the state of mind of the audience—a distinction impossible to draw. Without statutory definitions, the terms simply do not "assist in clearly articulating the proscriptions of the ordinance" or provide meaningful guidance regarding proscribed conduct." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264 (4th Cir. 2019); *see also Lytle v. Doyle*, 326 F.3d 463, 469 (4th Cir. 2003) ("[T]he vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of [the term at issue], but rather about what specific conduct is covered by the statute and what is not." (internal quotation marks and citation omitted)).

Even the word "incite" strikes at the heart of the vagueness concern presented by the statute. Indeed, "[e]very idea is an incitement" that "the only difference between the expression of an opinion and an incitement in the narrower sense is the speaker's enthusiasm for the result." *Gitlow v. People of State of New York*, 268 U.S. 652 (1925) (J. Holmes dissenting). For this reason "[e]loquence may set fire to reason." *Id.* Dictionary definitions are of no use, including "to urge or spur on; to stir up, animate, instigate, stimulate" or "to urge or provoke (some action)." Oxford Eng. Dict. Online, "incite," Oxford University Press. The difference between urging action, and merely provoking action, is significant indeed when the possibility of criminal consequences are attached.

36

Finally, while the Anti-Riot Act makes an effort to exclude protected speech from its immense grasp, this effort creates further ambiguity about what is, and is not, included by the statute. This "double negative" problem is addressed *infra* as it relates to overbreadth. Assuming *arguendo* the statute's literal inclusion of mere advocacy does not prove overbreadth, the cumbersome phrasing would be indecipherable to the ordinary person, confirming the law is unconstitutionally vague.

D. <u>The overt act requirement lacks any temporal tie to the Commerce Event, and includes attempts to perform "any other" overt act "for any purpose specified" as a riot-related activity creating two more sources of vagueness.</u>

The same overbreadth concerns set forth above about the Actual or Attempted Overt Act requirement in the statute also layer additional sources of ambiguity onto the statutory framework. First, the fact that the required intent must only exist at the moment of travel, or when the email was sent, or credit card used, means that the statute allows the requisite criminal intent to be frozen at the moment of interstate travel or use of commerce, and this becomes sufficient to infect *any* subsequent actions that could be committed without the specific criminal intent. This attenuation between the *mens rea* and the *actus reus* necessarily means there is no fair warning and clearly discernable standard for application and adjudication.

Second, the fact that the Actual or Attempted Overt Act can be "any other overt act for any purpose specified in subparagraph (A), (B), (C), or (D) of this paragraph" is vague as well. As set forth above, this amounts to an overt act towards an overt act. And merely an attempt to commit "any other" overt act "for any

37

purpose" specified in the Prohibited Riot Activities would suffice.  The result is an

over-arching vagueness about the critical question of what acts are indeed criminal.

E.  <u>Vagueness concerns are heightened where constitutionally-protected speech is at stake.</u>

The pervasive ambiguities in this statutory framework would render any statute

void for vagueness.  But the fact that constitutionally protected speech is at stake

requires an even higher burden.  Indeed,

> [P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

*Hoffman Estates*, 455 U.S. at 499.  "What renders a statute vague is not the possibility

that it will sometimes be difficult to determine whether the incriminating fact it

establishes *has been proved*; but rather the indeterminacy of precisely *what that fact is*."

*Williams*, 553 U.S. at 306.  The Anti-Riot Act presents this precise problem, not of

proof, but of discerning what the incriminating facts are.

## CONCLUSION

For the reasons set forth herein, this Court should find that the Anti-Riot Act

is unconstitutional on its face, and vacate the convictions of the Appellants.

Respectfully submitted this 1st day of October 2019.

JUVAL O. SCOTT
Federal Public Defender
for the Western District of Virginia

 /s/ Lisa M. Lorish
LISA MARIE LORISH
Va. Bar No. 81465
Assistant Federal Public Defender
401 E. Market Street, Suite 106
Charlottesville, VA  22902
(434) 220-3380

*Counsel for Appellant Daley*

 /s/ Raymond C. Tarlton
RAYMOND C. TARLTON
TARLTON | POLK PLLC
3905 Haworth Drive, Suite 207 (27609)
PO Box 1386 (27602)
Raleigh, NC
(919) 948-6464

*Counsel for Appellant Miselis*

## **REQUEST FOR ORAL ARGUMENT**

Counsel for the Appellants asserts that the issues raised in this brief may be more fully developed through oral argument, and respectfully requests the same.

## **CERTIFICATE OF COMPLIANCE**

1. The brief of the appellant has been prepared using Microsoft Word 2013 software, Garamond font, 14 point proportional type size.

2. EXCLUSIVE of the table of contents, table of authorities, statement with respect to oral argument, any addendums, and the certificate of service, this brief contains 10,032 words and is compliant with Fed. R. App. Pr. 32(a)(7)(B).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

10/1/2019            /s/ Lisa M. Lorish

Date                      Lisa M. Lorish

                           Assistant Federal Public Defender

## **CERTIFICATE OF SERVICE**

This is to certify that this Brief of Appellant was electronically filed on

October 1, 2019, and that true and correct copies of the foregoing Brief and of the

Joint Appendix will be sent by first-class, postage-prepaid mail on the next business

day to:

Laura Rottenborn

Assistant United States Attorney

P.O. Box 1709

Roanoke, VA 24008

/s/ Lisa M. Lorish

Lisa M. Lorish

Assistant Federal Public Defender