# RECORD NO. 19-4550(L); 19-4551

In The
## United States Court Of Appeals
## For The Fourth Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff – Appellee,*

**v.**

**MICHAEL PAUL MISELIS;**
**BENJAMIN DRAKE DALEY; and**
**THOMAS WALTER GILLEN,**

*Defendants – Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**AT CHARLOTTESVILLE**

**BRIEF OF AMICUS CURIAE THE FREE EXPRESSION FOUNDATION, INC., IN SUPPORT OF DEFENDANTS/APPELLANTS REVERSING DISTRICT COURT JUDGMENTS**

**The Free Expression Foundation, Inc.**
**P.O. Box 1479**
**Upper Marlboro, MD 20774**

**Represented by:**

**Glen K. Allen, Esq.**
**502 Edgevale Road**
**Baltimore, MD 21210**
**(410) 802-6453**

***Counsel for Free Expression Foundation, Inc., as Amicus Curiae***

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 19-4550(L Caption: United States v. Miselis, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

The Free Expression Foundation, Inc.
(name of party/amicus)

who is amicus, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: Glen K. Allen Date: October 8, 2019

Counsel for: The Free Expression Foundation, Inc.

## CERTIFICATE OF SERVICE

**************************

I certify that on October 8, 2019 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Glen K. Allen
(signature)

Ocotber 8, 2019
(date)



Print Save Reset Form

# TABLE OF CONTENTS

**Page:**

DISCLOSURE OF CORPORATE AFFILIATIONS
AND OTHER INTERESTS

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF INTEREST OF AMICUS CURIAE ..........................................1

FED. R. APP. P. 29(a)(4)(E) STATEMENT..........................................................3

SOURCE OF AUTHORITY TO FILE ....................................................................3

ARGUMENT ...........................................................................................................3

I. APPLICATION OF THE BALANCING TEST SET FORTH IN *UNITED STATES v. WILLIAMS*, 553 U.S. 285 (2008), DECISIVELY UNDERSCORES THE UNCONSTITUTIONAL OVERBREADTH OF THE ANTI-RIOT ACT.................................... 3

II. STRICT SCRUTINY, NOT INTERMEDIATE SCRUTINY,IS THE PROPER STANDARD FOR REVIEWING THE ANTI-RIOT ACT..........................................................................................9

III. THE TRIAL COURT, IN UPHOLDING THE CONSTITUTIONALITY OF THE ANTI-RIOT ACT, COMMITTED THREE CRITICAL ERRORS..................................13

IV. THE ANTI-RIOT ACT VIOLATES THE HECKLERS' VETO DOCTRINE..........................................................................................15

CONCLUSION .......................................................................................................17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Berger v. Battaglia*,
779 F.2d 992 (4th Cir. 1985) ....................16

*Bible Believers v. Wayne County, Michigan*,
805 F.3d 228 (6th Cir. 2015) ....................16

*Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987)....................14

*Brandenburg v. Ohio*,
395 U.S. 444 (1969)....................7

*Clark v. Community for Creative Non-Violence*,
468 U.S. 288 (1984)....................12

*Chicago Police Dept. v. Mosley*,
408 U.S. 92 (1972)....................17

*Cox v. Louisiana*,
379 U.S. 536 (1965)....................17

*De Jonge v. Oregon*,
299 U.S. 353 (1937)....................8

*Forsyth County, Georgia v. Nationalist Movement*,
505 U.S. 123 (1992)....................16

*Hess v. Indiana*,
414 U.S. 105 (1973)....................7

*In re Shead*,
302 F. Supp. 560 (N.D. Cal. 1969)....................14

*Manning v. Caldwell for City of Roanoke*,
930 F.3d 264 (4th Cir. 2019) (*en banc*)....................................................16

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)...........................................................................7, 8

*Perry Ed. Assn. v. Perry Local Educators' Assn.*,
460 U.S. 37 (1983)..........................................................................13, 17

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)............................................................................13

*Reed v. Town of Gilbert, Arizona*,
576 U.S. __ , 135 S. Ct. 2218 (2015) ....................................................11

*Reno v. American Civil Liberties Union*,
521 U.S. 844 (1997)............................................................................14

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)............................................................................17

*Terminiello v. City of Chicago*,
337 U.S. 1 (1949)................................................................................13

*Texas v. Johnson*,
491 U.S. 397 (1989)..............................................................................7

*Turner Broadcasting System, Inc. v. FCC*,
512 U.S. 622 (1994)............................................................................11

*United States v. Daley*,
378 F. Supp. 3d 539 (W.D. Va. 2019)...............................................10, 13

*United States. v. Dellinger*,
472 F.2d 340 (7th Cir. 1972) ........................................................*passim*

*United States v. Eichman*,
496 U.S. 310 (1990)............................................................................11

*United States v. Grace*,
461 U.S. 171 (1983)....................12

*United States v. Rundo, et al.*,
Central District of California, Case No. CR-18-00759-CJC,
Memorandum Opinion dated June 3, 2019
(available on PACER; Docket Entry No. 145)....................*passim*

*United States v. Stevens*,
559 U.S. 460 (2010)....................4, 15

*United States v. Williams*,
553 U.S. 285 (2008)....................3, 4, 17

*Whitney v. California*,
274 U.S. 357 (1927).................... 1-2

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009)....................17

**Statutes:**

18 U.S.C. § 113....................9

18 U.S.C. § 231....................9

18 U.S.C. § 1985....................9

18 U.S.C. § 2101....................*passim*

18 U.S.C. § 2102....................8

**Constitutional Provision:**

U.S. Const. amend. I....................*passim*

The Free Expression Foundation, Inc., respectfully submits this brief as amicus curiae in support of the Defendants/Appellants Michael Miselis, Benjamin Daley, and Thomas Gillen.

**STATEMENT OF INTEREST**

The Free Expression Foundation, Inc. ("FEF") is a fledgling 501c3 nonprofit dedicated to providing legal support for persons that have suffered legal, financial, or social harm as a result of the exercise or attempted exercise of their rights of free expression and assembly, including their rights under the First Amendment. By fulfilling its mission, and specifically by submitting amicus curiae briefs in key cases, FEF seeks to highlight and combat the growing threats to free expression and freedom of assembly that have arisen in contemporary America -- a cultural milieu increasingly beset by polarized viewpoints, invasive technology, disregard for the rule of law, and the breakdown of dialogue. Aspiring to protect the "uninhibited, robust, and wide open" debate on public issues that seminal First Amendment jurisprudence has articulated, FEF is particularly concerned about statutes, such as the Anti-Riot Act, that jeopardize both free speech and freedom of assembly.

Three premises underlie FEF's commitment to the First Amendment arena. The first is that open and robust debate is essential to the vital health and even survival of the democratic processes to which our nation is dedicated. This premise was articulated eloquently by Justice Brandeis in his concurrence in *Whitney v.*

*California*, 274 U.S. 357 (1927). The second is that of the branches of government, the courts, and the federal courts in particular, are uniquely equipped and tasked to protect First Amendment freedoms. As a corollary to this, members of the legal profession have a special responsibility to assist the courts in defending unpopular viewpoints.

The third is that First Amendment freedoms are fragile and currently face novel and formidable perils. Debate on numerous controversies has become more strident and polarized while new means of censorship, such as deplatforming, doxxing, and cyber harassment, have combined with age-old types of censorship, such as hectoring and ill-advised legislation, to create an atmosphere in which citizens have become fearful to speak their minds. At the same time, organizations that have traditionally defended unpopular viewpoints, such as the American Civil Liberties Union, are retreating from the First Amendment arena.

On these premises rests FEF's mission to be a true friend of the court by presenting First Amendment issues and arguments that are broader than may be presented by the parties. In this case in particular, FEF believes its amicus brief provides perspectives on the Anti-Riot Act different from and more inclusive than those set forth in the briefs of the parties.

FEF's amicus brief on the Anti-Riot Act was accepted by the court in *United States v. Rundo, et al.*, Central District of California, Case No. CR-18-00759-CJC.

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

No party's counsel authored this amicus brief in whole or in part; no party or party's counsel contributed money that was intended to fund submitting or preparing the brief; and no person – other than the amicus curiae, its members, or its counsel – contributed money that was intended to fund preparing or submitting the brief.

## SOURCE OF AUTHORITY TO FILE

Counsel for the Defendants/Appellants have stated they have no objection to FEF's filing of an amicus brief. Counsel for the government has also stated that the government has no objection.

## ARGUMENT

### I. APPLICATION OF THE BALANCING TEST SET FORTH IN *UNITED STATES v. WILLIAMS*, 553 U.S. 285 (2008), DECISIVELY UNDERSCORES THE UNCONSTITUTIONAL OVERBREADTH OF THE ANTI-RIOT ACT.

Appellants in their brief argue that the Anti-Riot Act is facially overbroad because it regulates a substantial amount of protected speech and assembly. FEF, concurring, cites *United States v. Williams*, 553 U.S. 285 (2008) as providing a balancing test to the proper application of the First Amendment overbreadth doctrine. Analysis under the *Williams* balancing test consists of several steps: reviewing the purpose of the challenged statute, reviewing the plainly legitimate sweep of the statute, reviewing the harmful effects of invalidating the statute,

reviewing the effects of the law on protected speech, and then, if prohibition of protected speech is substantial, balancing the competing social costs. 553 U.S. at 296. This analysis follows:

**(A) The Anti-Riot Act Covers Acts and Intentions that Might, But Need Not, Lead to "Riots."** As the Seventh Circuit in *United States v. Dellinger*, 472 F.2d 340, 357-58 (7th Cir. 1972), a case on which the trial court greatly relied, stated in interpreting the Act: "As to the Anti-riot Act, the government at times argues that travel with intent and not expression is the 'gravamen of the offense' and that, therefore, the doctrines of the first amendment are not relevant to our determination of constitutionality. We are unable to accept this argument . . . It is by expression, in whatever form, that causation adequate to bring on punishment must be most likely to occur." The *Dellinger* majority thus recognized the important impact of the Act on First Amendment expression. To then sustain the Act, the *Dellinger* majority was forced into extreme judicial reconstruction of the Act. This was improper. As the Supreme Court made clear in *United States v. Stevens*, 559 U.S. 460, 481 (2010), courts must not rewrite a law to conform to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain and diminish Congress's incentive to draft a narrowly tailored law in the first place.

Under the Act, properly interpreted, a crime consists of two parts. The first is mere interstate travel or use of any interstate facility with intent to riot or cause a

riot. The crime is then completed when there is an "overt act" or attempted "overt act." The Act thus covers the holding of an intent to commit any of a range of acts (mainly communication but also organizational) that might lead to a "riot," followed by an "overt act" which not need itself be a crime. This is not merely FEF's interpretation. A review of the government's indictment shows this is also the government's construction, for the following are included as alleged "overt acts": "On or about March 25, 2017, [defendants] traveled to and attended a purported political rally in or around Huntington Beach, California"; "on or about April 15, 2017, [defendants] reserved and rented an 1l-passenger van with a debit card to travel from Southern California to in or around Berkeley, California"; "during the summer of 2017 and prior to August 11, 2017, [defendants] purchased flights with debit and credit cards, from Los Angeles and San Francisco, California to Charlottesville, Virginia." See Indictment, Paragraph 10 (a), (c), and (f). Thus the Act, while generally directed at riots, covers mere intent and a wide range of perfectly legal activities.

**(B) The Anti-Riot Act's Inhibition on the Free Exchange of Ideas and on Free Assembly Overwhelms Its Legitimate Scope.** The Anti-Riot Act purposefully and manifestly covers acts of expression and assembly. The government below asserted that the sole purpose of the Act is controlling violence. As noted, however, the actions made criminal by the Act are not acts of violence but

mere holding of intent while crossing a state line of using "any facility of interstate or foreign commerce or including, but not limited to, the mail, telegraph, telephone, radio, or television," followed at some later time by an "overt act." While controlling violence at political assemblies is a legitimate goal, the improperly broad sweep of the Anti-Riot Act was to control communications that might possibly (but not necessarily) lead to riots by controlling the intent of citizens as they crossed state lines. As Judge Carney held in his opinion in the California RAM case striking down the Act: "Criminalizing acts and imminent threats of violence is a legitimate aim. But the Anti-Riot Act does not focus on the regulation of violence. Rather, it focuses on pre-riot communications and actions. In in doing so, it sweeps in a wide swath of protected activity as part of its efforts to punish rioting." *United States v. Rundo, et al.*, Central District of California, Case No. CR-18-00759-CJC, Memorandum Opinion dated June 3, 2019 (available on PACER; Docket Entry No. 145) (hereafter "*Rundo*") at page 10.

*United States v. Dellinger* contains a powerful dissenting opinion by Judge Pell, in which he states: "I entertain no doubts but that the statute under which the appellants were prosecuted [Section 2101] is facially unconstitutional in that it is clearly violative of the First Amendment right of freedom of speech." Since 1972, the Supreme Court has issued many opinions supportive of Judge Pell's dissent, all of which expand the protection of the First Amendment to include speech and

acts "likely to produce imminent disorder." In this regard, the Appellants, and Judge Carney in his *Rundo* opinion, have discussed *Brandenburg v. Ohio* 395 U.S. 444 (1969), *Hess v. Indiana,* 414 U.S. 105 (1973), and *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). *Texas v. Johnson*, 491 U.S. 397 (1989), also merits mention. In that case, the Supreme Court concluded that the State of Texas could not criminally sanction flag desecration in order to preserve the flag as a symbol of national unity. It also held that the flag desecration statute did not meet the State's goal of preventing breaches of the peace, since it was not drawn narrowly enough to encompass only flag burnings that would likely result in serious disturbances, and since the flag burning in that case did not threaten such a reaction: "Expression may not be prohibited on the basis that an audience that takes serious offense to the expression may disturb the peace, since the Government cannot assume that every expression of a provocative idea will incite a riot, but must look to the actual circumstances surrounding the expression." 491 U.S. at 406.

The impact of the Anti-Riot Act on the right to assemble and associate for First Amendment purposes must also be considered in balancing competing social costs. The Supreme Court has stated regarding Freedom of Assembly:

> The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances . . . It follows from these considerations that, consistently with the Federal

> Constitution, peaceable assembly for lawful discussion cannot be made a crime. The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score.

*De Jonge v. Oregon*, 299 U.S. 353, 364, 365 (1937). The Anti-Riot Act affects the right to hold assemblies because it makes the organizers liable for the acts of third parties. *See Dellinger*, 472 F.2d at 360, 410. Congress in the Anti-Riot Act failed to consider that the "others" "incited" to riot might not be part of the legal assembly but would be aggressive counterprotestors. The definition of "riot" in 18 U.S.C § 2102 is consequently far too broad. It does not have a requirement that the three people are acting in accord with the organizer of the assembly.

In summary, with respect to First Amendment jurisprudence the Anti-Riot Act is radically misaligned with the shift in the Supreme Court's opinions over the last 50 years. If the Appellants' inflammatory expressions are protected, as they are, the mere intent to utter such protected language cannot be a crime. There is thus a fundamental contradiction between the Anti-Riot Act's criminalization of intended expression, i.e., to incite, organize, promote or encourage, and *Claiborne*, among other recent cases. The Act also markedly infringes on the right of assembly.

(**C) Invalidating the Anti-Riot Act Will Have Few or No Harmful Social Costs**. The Anti-Riot Act has been invoked rarely in the last 40 years. The last major prosecution under the Act was in 1973 against the Gainesville Eight, a group of anti-

Vietnam War veterans indicted on charges of conspiring to disrupt the 1972 Republican National Convention. The Act is an unused, unnecessary, and problematic law which, in this case, has involved federal intervention in scuffles between various political groups at legal assemblies. The annulment of the Act would not leave any gap in the ability of the government to punish rioters. As Judge Carney noted in his *Rundo* opinion with regard to California, the states have their own laws directed at unlawful rioting and the Federal government has alternatives under 18 U.S.C. § 113 (assault crimes), 18 U.S.C. § 231 (civil disorders), and 18 U.S.C. § 1985, among many others. *Rundo*, Memo. Op. at 11.

In conclusion, while invalidating a federal law is a serious step for a court, the application of the required *Williams* analysis shows that the Anti-Riot Act is unconstitutionally infirm under the overbreadth doctrine.

## II. STRICT SCRUTINY, NOT INTERMEDIATE SCRUTINY, IS THE PROPER STANDARD FOR REVIEWING THE ANTI-RIOT ACT.

The trial court, to its credit, addressed an issue that none of the parties had raised and to FEF's knowledge no prior court had ever considered, namely whether review of the Anti-Riot Act is subject to a strict scrutiny standard of review. The court, asserting there was little evidence the Act was enacted for the purpose of affecting the content of speech, held the Act was content neutral, did not favor any type of speech over others but merely regulated time, place, and manner,

and accordingly was subject only to intermediate scrutiny. *United States v. Daley*, 378 F. Supp. 3d 539, 553-54 and 554 n. 17 (W.D. Va. 2019). In so holding, FEF submits, the court erred.

The Act in fact is not content neutral but disfavors a critically important kind of speech: the kind that arouses fervid emotions and spurs people to organize demonstrations and counter-demonstrations, to travel sometimes considerable distances to those demonstrations, and to confront their adversaries in person. Not all speech protected by the First Amendment is of this nature; to cite only a few examples, the Act has little or no effect on protected speech via written publications, speech over the Internet, speech at the workplace, campaign finance speech, speech in school environments, or protected commercial speech. But there are many topics that do inspire confrontational demonstrations and counter demonstrations, e.g., abortion, immigration, wars, and confederate statues, and all these are greatly burdened by the chilling effect of the Act. The Act sends the unfortunate message, both to would-be demonstrators and the attorneys who might advise them, that if such persons have ardent, impassioned views on a topic and know that there are adversaries who have ardent contrary views, the safest course is to stay at home and express their views anonymously over the Internet rather than in person at a demonstration, especially if their views are politically unpopular.

The trial court's holding notwithstanding, this chilling effect falls well within the general purpose of the Act. As both Judge Carney in his *Rundo* opinion and the Appellants in their principal brief have noted, the Act was passed in 1968 as part of the Civil Rights Act to give the government a tool to reign in civil rights demonstrations and protests against the Vietnam War. *See Rundo*, Memo. Op. at 10 ("Congress passed the Anti-Riot Act over concerns in the late 1960s about public disturbances associated with the Civil Rights Movement and anti-Vietnam Was protests"); Appellants' brief at 23. In light of this legislative purpose, strict scrutiny should be applied.

Even assuming for sake of argument, however, that no such Congressional purpose could be found, the Supreme Court has made clear that illicit legislative intent is not the *sine qua non* of a First Amendment violation and a party opposing the government need not adduce evidence of an improper censorial motive. *See Reed v. Town of Gilbert, Arizona*, 576 U.S. ___, 135 S. Ct. 2218, 2228 (2015). Although "a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642 (1994). In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral. *See, e.g., United States v. Eichman*, 496 U.S. 310, 315 (1990) ("Although the [statute] contains no explicit content-based limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted interest is related to

the suppression of free expression") (internal quotation marks omitted); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (requiring that a facially content-neutral ban on camping must be "justified without reference to the content of the regulated speech").

Accordingly, even assuming, contrary to fact, a Congressional purpose that was not content-based, strict scrutiny should nonetheless be applied to the Act because it manifestly entrenches on core First Amendment expression. The Act purports to be "anti-riot." But as both the *Dellinger* opinion and Judge Carney observed:

> A riot is closely intertwined with political activity. A rioting crowd is often protesting the policies of a government, an employer, or some other institution, or the social fabric in general. A riot may well erupt out of an originally peaceful demonstration. The political nature of a riot increases the risk that the Anti-Riot Act criminalizes a substantial amount of protected expressive activity.

*Rundo*, Memo. Op. at 11. Moreover, the "riots" nearly always occur, as they did in this case, in traditional public fora such as streets and parks, fora that our First Amendment cases so assiduously protect. Such areas occupy a "special position in terms of First Amendment protection" because of their historic role as sites for discussion and debate. *See, e.g., United States v. Grace*, 461 U.S. 171, 180 (1983). These places "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts

between citizens, and discussing public questions." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (quoting *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983)). Moreover, insofar as the Act seeks to criminalize "incitement," it is restricting core political speech. *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). This Court, accordingly, should apply strict scrutiny to its review of the Anti-Riot Act, although FEF hastens to add that even under intermediate scrutiny the statute fails to pass constitutional muster.

## III. THE TRIAL COURT, IN UPHOLDING THE CONSTITUTIONALITY OF THE ANTI-RIOT ACT, COMMITTED THREE CRITICAL ERRORS.

In addition to failing to apply strict scrutiny to the Anti-Riot Act, the trial court committed three critical errors in its reasoning upholding the constitutionality of the Act. These related errors are the following: first, the court's assertion that the Act is narrowly tailored, *Daley*, 378 F. Supp. 3d at 554; second, its holding that 18 U.S.C. § 2101 "only regulates either violence in furtherance of a riot or the unprotected incitement or instigation of a riot," *id*.; and third, its holding that the Act "logically require[s] that the riot occur, at least to the extent specified in § 2102(a)(2)," *id*. at 556 (quoting *Dellinger*). All have in common that they reflect (1) the court's omission to take into account changes in First Amendment jurisprudence and societal changes in the last half century, and (2) the court's aggressive rewriting of the Act in an attempt to make it constitutional.

At the foundation of these errors is the court's uncritical fealty to 50 year old precedents. The court expresses this allegiance repeatedly, e.g., "the Court's construction of § 2101 is largely informed by other judicial constructions of the Act," 378 F.3d at 553, "the Court echoes prior decisions interpreting the Act," *id*. at 557, and "prior interpretations of the Act provide critical context for how the statute has been understood," *id*. at 553 n. 16. But since the passage of the Act and the issuance of these opinions, First Amendment law has shifted markedly, not least in its departure from the clear and present danger test. Moreover, since 1968 there has been a vast expansion of facilities of interstate commerce. The expansion of the Internet and credit facilities have expanded the reach of the Act into the mobile telephones in students' backpacks and the home computer in nearly every home. A statute intended to curb outside agitators who wished to incite riots now reaches nearly all citizens as they go about their ordinary daily activities.

Also at the root of the court's errors was its omission to take into account restrictions on judicial construction that have occurred since the *Dellinger* and *In re Shead*, 302 F. Supp. 560 (N.D. Cal. 1969) cases on which it relies. Among these are that more caution is required in the realm of criminal statutes, *see, e.g.*, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 872 (1997), and *Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S.569, 575-76 (1987), and

that courts must not rewrite laws to make them conform to constitutional requirements, *Stevens*, 559 U.S. at 481.

## IV. THE ANTI-RIOT ACT VIOLATES THE HECKLERS' VETO DOCTRINE

Envision, if the Court will, the following set of facts. A citizen -- call him Citizen A -- has strongly-held views on a controversial topic. He learns of a demonstration in another state relating to the controversial topic and decides to attend. A group -- call it Group X -- publicly announces that persons espousing Citizen A's views who attend the demonstration will be assaulted. Group X's threats are credible, as it has a history of violence. Citizen A declines to accede to the threat and, intending to defend himself if necessary, travels to the demonstration. Hundreds of persons, for and against the demonstration, attend. Group X carries through on its threats and numerous scuffles ensue, including one in which Citizen A is entangled.

Judging from the indictment in this case, it is the government's view that Citizen A can be prosecuted under the Anti-Riot Act based on the above facts -- i.e., based simply on his intention while crossing state lines to defend himself from physical assault, if necessary, as he exercises his First Amendment right to attend the demonstration. That the Anti-Riot Act even arguably lends itself to such an interpretation shows the grave danger and unconstitutional nature of the statute. It

places enormous power into the hands of hostile audiences, such as Group X, to disrupt or even prevent demonstrations of which they disapprove. All they need do is make credible public threats that persons attending a demonstration will be assaulted, and such persons would attend the demonstration at peril of criminal liability if they had the intention of defending themselves from assaults.

The Supreme Court has properly erected doctrinal barriers against such extortionate conduct by hostile audiences. Prominent among these is the Heckler's Veto doctrine.[1] As the Supreme Court noted in *Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123, 134 (1992): "[l]isteners' reaction to speech is not a content-neutral basis for regulation." Holding otherwise would "encourage the insidious threat of a 'heckler's veto,' where 'speech assertedly or demonstrably offensive to some elements of the public is silenced to avoid disruption.'" *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985). As the Sixth Circuit recently summarized in *Bible Believers v. Wayne County, Michigan*, 805 F.3d 228, 247-48 (6th Cir. 2015):

[1] The Heckler's Veto doctrine was not specifically raised below, although, FEF submits, it was implicit in the First Amendment challenges that were addressed. In any event, this Court has stated that it regularly exercises its discretion to address issues of public importance not raised below when, as here, the record provides an adequate basis to address the issue and no party is prejudiced. *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 271 (4th Cir. 2019) (*en banc*).

> It is a fundamental precept of the First Amendment that the government cannot favor the rights of one private speaker over those of another. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Accordingly, content-based restrictions on constitutionally protected speech are anathema to the First Amendment and are deemed "presumptively invalid." *Ysursa v. Pocatello Educ. Ass'n,* 555 U.S. 353, 358 (2009). An especially "egregious" form of content-based discrimination is that which is designed to exclude a particular point of view from the marketplace of ideas. *Rosenberger*, 515 U.S. at 829; *Perry Educ. Ass'n*, 460 U.S. at 62 (Brennan, J., dissenting) ("Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'"). The heckler's veto is precisely that type of odious viewpoint discrimination. *Cf. Police Dep't of Chi*., 408 U.S. at 98 ("'[T]o deny this . . . group use of the streets because of their views . . . amounts . . . to an invidious discrimination.'" (quoting *Cox*, 379 U.S. at 581 (Black, J., concurring))).

The Anti-Riot Act is antithetical to the values and policies on which the Heckler's Veto doctrine rests and, accordingly, is unconstitutional on this as well as other grounds.

## CONCLUSION

The application of *Williams* to the Anti-Riot Act should include consideration of its impact on First Amendment protected rights of assembly and association. The Act regulates a substantial amount of protected speech and assembly and there is no counterbalancing sociality benefit in the Act itself. There is no way to save the Act by judicial construction. Congress spread its net far too widely when hastily drafting the Anti-Riot Act in 1968. From the outset it has been unconstitutional, in light of

its vagueness, overbreadth, and conflicts with the Heckler's Veto doctrine and other First Amendment doctrines. But its defects have become even more manifest in the last 50 years, given recent Supreme Court rulings on protected expression. Congress did not consider that its definition of riot in the Act was too broad, its imposition of liability too expansive, and its definition of intent too amorphous and inclusive, all to the effect of denying First Amendment protections to marginal groups most in need of them. For these reasons and the reasons set forth in the Appellants' brief, FEF urges that the trial court's ruling be reversed and the Act be declared unconstitutional.

Respectfully submitted,

s/ Glen K. Allen
Glen K. Allen, Esq.
502 Edgevale Road
Baltimore, MD 21210
410-802-6453

Counsel for Free Expression
Foundation, Inc.
as Amicus Curiae

**REQUEST FOR ORAL ARGUMENT**

Counsel for Amicus Free Expression Foundation, Inc. will gladly participate in oral argument if invited by the Court.

## CERTIFICATE OF COMPLIANCE

1. This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   this document contains 4,358 words.

2. This document complies with the typeface requirements because:

   this document has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated: October 8, 2019

/s/ Glen K. Allen
Glen K. Allen

*Counsel for Free Expression Foundation, Inc., as Amicus Curiae*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 8, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all the registered CM/ECF users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Victor Escobar
Victor Escobar
GIBSON MOORE APPELLATE SERVICES, LLC
P.O. Box 1460
Richmond, VA 23218
(804) 249-7770
victor@gibsonmoore.net