No. 19-4550 (L)

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**UNITED STATES OF AMERICA**,

*Appellee,*

v.

**MICHAEL MISELIS, et al.,**

*Appellants.*

On Appeal from the United States District Court
for the Western District of Virginia
Charlottesville Division (Hon. Norman K. Moon)

**REPLY BRIEF OF THE APPELLANTS**

**JUVAL O. SCOTT**
Federal Public Defender
  for the Western District of Virginia

**LISA M. LORISH**
Assistant Federal Public Defender
401 E. Market Street, Suite 106
Charlottesville, VA 22902
(434) 220-3380

*Counsel for Appellant Daley*

**RAYMOND C. TARLTON**
TARLTON | POLK PLLC
3905 Haworth Drive, Suite 207 (27609)
PO Box 1386 (27602)
Raleigh, NC
(919) 948-6464

*Counsel for Appellant Miselis*

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ................................................................................ii

ARGUMENT ............................................................................................................1

I.  The Court should not rewrite the statute to save it from overbreadth ................3

    A.  A narrowing construction only applies if the text of the statute or congressional intent show clear lines that can be drawn to save the statute .................................................................................................3

    B.  Congress intentionally passed broad anti-riot legislation after 3 years of deliberation ...............................................................................5

    C.  The elements of the Act require a Commerce Event and "any other overt act" taken for the purpose of one of the Riot-Related Activities ....8

    D.  The Act does not require that the intent at the time of the Commerce Event be the same, or sufficiently similar, to the intent at the time of any other overt act .......................................................11

    E.  This Court should give plain meaning to the words Congress actually used and not rewrite nearly all of the operative terms ................12

    F.  Without a basis in the text or congressional intent to draw a clear line, narrow construction is inappropriate, and the statute is overbroad under any level of scrutiny .......................................................20

II.  The Act is not severable, and even if it was, the Appellants' convictions must be vacated ..................................................................................................23

    A.  An unconstitutional provision cannot be severed if the remainder of the act would not have been enacted on its own ...................................24

    B.  Excising the parts of the law that deal with speech and expression would result in a bill that focuses on local violent action, which is not what Congress intended to criminalize .............................................26

    C.  In any event, a severed statute would still require vacating the Appellants' convictions ...................................................................30

III.  The Act is unconstitutionally vague ........................................................32

CONCLUSION .................................................................................................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### Cases

*Alaska Airlines, Inc. v. Brock,* 480 U.S. 678 (1987) ..............................................24, 25, 30

*Ayotte v. Planned Parenthood of Northern New England,* 564 U.S. 320 (2006) ......................25

*Beverly v. United States,* 468 F.2d 732 (5th Cir. 1972) ...........................................22

*Boos v. Barry,* 485 U.S. 312 (1988) ......................................................21

*Brandenburg v. Ohio,* 395 U.S. 444 (1969)..............................................13, 18, 19

*Broadrick v. Oklahoma,* 413 U.S. 601 (1973) ............................................20

*Carandola v. Bason,* 303 F.3d 507 (4th Cir. 2002) ......................................20

*Chamlin Rfg. Co. v. Corp. Comm'n of Okla.,* 286 U.S. 210 (1932) ........................................24

*Elonis v. United States,* 135 S. Ct. 2001 (2015)........................................20

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,* 130 S. Ct. 3138 (2010) ............. 24, 25

*I.N.S. v. Cardoza-Fonseca,* 480 U.S. 421 (1987) .......................................10

*I.N.S. v. Chadha,* 462 U.S. 919 (1983) ................................................25

*In re Application of Madison,* 687 F.Supp.2d 103 (E.D.N.Y. 2009) ....................................22

*In re Shead,* 302 F. Supp. 560 (N.D. Cal. 1969).........................................22

*Jennings v. Rodriguez,* 138 S. Ct. 830 (2018)..........................................3, 4

*Landmark Comms., Inc. v. Virginia,* 435 U.S. 829 (1978) .....................................19

*Malta-Espinoza v. Gonzales,* 478 F.3d 1080 (9th Cir. 2007) .................................31

iii

*Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172 (1999) ............................24

*Nat'l Mobilization Comm. to End the War in Viet Nam v. Foran,*
   411 F.2d 934 (7th Cir. 1969) .......................................................22

*R.R. Ret. Bd. v. Alton R.R. Co.,* 295 U.S. 330 (1935) ..........................................25

*Randall v. Sorrell,* 548 U.S. 230 (2006) ........................................................25

*Reno v. Am. Civil Liberties Union,* 521 U.S. 844 (1997) ..........................................4

*Satellite Broad v. F.C.C.,* 275 F.3d 337 (4th Cir. 2001) .........................................21

*Texas v. Johnson,* 491 U.S. 397 (1989) ..........................................................20

*United States v. Camil,* 497 F.2d 225 (5th Cir. 1974) ...........................................22

*United States v. Carter,* No. 17-cr-190 (E.D. Wis.) ............................................22

*United States v. Dellinger,* 472 F.2d 340 (7th Cir. 1972) .........................................9, 21, 22

*United States v. Hoffman,* No. 973-71 (D.D.C.) .................................................22

*United States v. Markiewicz,* 978 F.3d 786 (2d Cir. 1992) ........................................21

*United States v. McNamara-Harvey,* No. 2:10-cr-219 (E.D. Penn.) .................................22

*United States v. Nat'l Treasury Employees Union,* 513 U.S. 454 (1995) ...........................4, 25

*United States v. Reese,* 92 U.S. 214 (1876) ....................................................25

*United States v. Ruffin,* No. 17-cr-129 (E.D. Wisc.) ............................................22

*United States v. Seale,* 497 F.2d 225 (5th Cir. 1974) ...........................................22

*United States v. Stevens,* 559 U.S. 460 (2010) ...........................................*passim*

*United States v. Vann,* 660 F.3d 771 (4th Cir. 2011) ...........................................3, 31

iv

*United States v. Williams*, 553 U.S. 285 (2008) ................................................. 3, 13

*Virginia v. American Bookseller's Assn., Inc.,* 484 U.S. 383 (1988) ............................................3

*Virginia v. Black,* 538 U.S. 343 (2003) ...............................................19

## Other Sources

18 U.S.C. § 48...............................................................................14

18 U.S.C. § 371.............................................................................31

18 U.S.C. § 2101 .................................................................... 14, 31

## Attachments

*Congress & Federal Anti-Riot Proposals, Pro-Con*, 47 Cong. Dig. 99 (1968)
(Attachment A) .........................................................................................5

Zalman, Marvin. The Federal Anti-Riot Act and Political Crime: The Need for
Criminal Law Theory, 20 *Villanova L. Rev.* 5-6 at 897 (Attachment B) .................. 5, 7, 8

"The 1966 Cramer Bill," H.R. 14765, 89th Cong. § 502 (Attachment C)................ 5, 11

"The 1967 House Bill," H.R. 421, 90th Cong. § 2101 (Attachment D) .................*passim*

"Thurmond/Lausche Bill," H.R. 2516, 90th Cong., Amdt. No. 589
(Attachment E) ............................................................... 7, 9, 11, 16, 27

"The Johnson Administration Bill," Federal Anti-Riot Act of 1968, H.R. 15748,
90th Cong. (Attachment F) ..................................................................*passim*

Memorandum on H.R. 2516, 114 Cong. Rec. 9609-9611 (Attachment G) ........9, 16, 18

Danner, Herbert. The Civil Rights Act of 1968, Brief Summary of Basic
Provisions, *Library of Congress Legislative Reference Service* (1968) (Attachment H)............16

<u>Introduction</u>

The only issue in this case is the constitutional viability of a fiercely debated and seldom utilized law, the Anti-Riot Act ("Act") of 1968. So seldom, that the Government has identified only one other completed successful prosecution under the law, ever. The Government plainly admits numerous constitutional problems with the Act. But instead of examining the statute as written and evaluating the legislative history to see the explicit intent of its authors, the Government begins from the premise that this Court must save this statute and then sets out to show how the Court could rewrite the Act in a constitutional manner by taking all of the following steps:

- Require that the intent at the time of the Commerce Event be "sufficiently similar" to the intent at the time of the later Actual or Attempted Overt Act such that it is "the same as or the evolving product of the one intended earlier;"

- Rewrite the *actus reus* from "performs or attempts to perform any other overt" to say "achieves one of the purposes specified in subparagraphs (A), (B), (C), or (D);"

- Require a jury be instructed that the prohibited act be committed with specific intent to riot;

- Rewrite the definition of inciting a riot which explicitly *included* "advocacy of any act of acts of violence or assertion of the rightness of, or the right to commit, any such act or acts" to say the exact opposite;

- Construe "organizing," "promoting," and "encouraging" a riot to all mean "incitement of a riot" which is already separately listed as a prohibited Riot-Related Activity;

- Interpret inciting, organizing, promoting, encouraging, participating in, and carrying on a riot to all exclusively mean "urging or instigating other persons to

1

riot" notwithstanding that the statute says these terms "include, but are not limited to" urging and instigating;

- Construe "incitement" as requiring intent, imminence, and likelihood of lawless action despite that the statute allows for the opposite;

- Limit "clear and present danger" to mean something other than what the Supreme Court says it means: balancing the character and likelihood of the evil against the need for free and unfettered expression; and

- Interpret threat of the commission of an act of violence to mean a "true threat" evaluated under an objective standard.

The Government's invitation to rewrite nearly every aspect of the Act is precisely the invitation the Supreme Court rejected in *Stevens* when it struck down a similarly sweeping statute on First Amendment overbreadth grounds. *United States v. Stevens*, 559 U.S. 460, 481 (2010).

If the Court is unwilling to save the statute through narrow construction, the Government suggests severance and excision. But Congress did not intend what the Government proposes. Congress passed the Act with a clear focus on addressing the civil rights riots of the 1960's by prosecuting behind-the-scenes agitators that they believed were traveling from state to state teaching, preaching, and advocating for civil disobedience. Congress deliberately chose the broadest, most expansive proposed version of the bill from among several competing narrower proposals. The only part of the Act the Government wants to keep – regulation of violent conduct – is what Congress explicitly left to the province of the States. Even if excision were possible, however, the Appellants pled guilty to conspiracy to commit a violation of the Act

2

and the underlying conduct is presumed to fall under the excised portions of the Act. *See United States v. Vann*, 660 F.3d 771, 774 (4th Cir. 2011) (en banc).

If emotionally charged deplorable speech crosses the line into violence, there are numerous existing, constitutional, federal statutes that the federal Government can use to prosecute that violence without eroding civil liberties.[1] Instead of judicially creating a new and different constitutional version of the Act, this Court must strike the entire statute down.

## I.    <u>The Court should not rewrite the statute to save it from overbreadth</u>

In response to an overbreadth challenge a court must: (1) construe the law; (2) determine whether a narrowing construction is consistent with the text or intent; (3) apply the appropriate level of scrutiny.

### A. A narrowing construction only applies if the text of the statute or congressional intent show clear lines that can be drawn to save the statute.

The first step in an overbreadth challenge is construing the statute.  *United States v. Williams*, 553 U.S. 285, 293 (2008).  This Court may only impose a limiting construction on a statute if the text is "readily susceptible" to such a construction. *Virginia v. American Bookseller's Assn., Inc.*, 484 U.S. 383, 397 (1988).  "In the absence of more than one plausible construction, the canon simply has not application."  *Jennings*

---

[1] German Michael and Sara Robinson.  Wrong Priorities on Fighting Terrorism, *Brennan Center for Justice* (2019) (identifying numerous existing statutes) (available at: https://www.brennancenter.org/sites/default/files/2019-08/Report_Wrong_Priorities_Terrorism.pdf).

3

*v. Rodriguez*, 138 S.Ct. 830, 842 (2018) (internal quotation omitted).  This Court should "not rewrite a . . . law to conform it to constitutional requirements." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884-84 (1997) (internal quotation omitted).  To do so would "sharply diminish Congress's 'incentive to draft a narrowly tailored law in the first place.'" *Stevens*, 559 U.S. at 481 (internal quotation omitted).  To determine if the Act is "readily susceptible" to limited construction this Court must consider whether "text or other source of congressional intent identified a clear line" that can be drawn. *Reno*, 521 U.S. at 884.

Where instead a statute is open-ended and a simple and obvious line cannot be drawn, the construction does not apply. *Reno*, 521 U.S. at 884.  For this reason, the Supreme Court refused to save a statute barring government employees from receiving outside honorari for writing and speaking by "drawing one or more lines between categories of speech covered by an overly broad statute, when Congress has sent inconsistent signals as to where the new line or lines should be drawn." *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479 n.26 (1995).  Doing so would have "involve[d] a far more serious invasion of the legislative domain." *Id.*  Similarly, the Supreme Court declined to narrowly construe a statute punishing the commercial creation, sale, or possession of certain depictions of animal cruelty to save it.  *Stevens*, 559 U.S. 460.  And the Court found that it was implausible to find an "implicit 6-month limit on the length of detention" in 8 U.S.C. §§ 1225(b)(1) and (b)(2) to save the statute.  *Jennings*, 138 S. Ct. at 843.  The Court explained that is "not how the

4

canon of constitutional avoidance works," and that "[s]potting a constitutional issue does not give a court the authority to rewrite a statute as it pleases." *Id.*

### B. Congress intentionally passed broad anti-riot legislation after 3 years of deliberation.

During the 1960s, Congress considered several different versions of anti-riot legislation as part of broader civil rights legislation to respond to numerous racially charged riots that broke out in cities across the country.[2]  The first significant bill was introduced by Representative Cramer on August 8, 1966, in the House of Representatives (hereinafter, "1966 Cramer Bill").[3]  This bill was modeled on the Fugitive Felon Act and passed the House on August 9, 1966, but the Senate never acted on it.[4]  Even at this early stage, constitutional problems with anti-riot measures were identified.  "Rather than punishing people for violence…this amendment would punish people for advocacy. . . [t]he danger with laws which punish advocacy is that they know no limitation."[5]

---

[2] Because the Government did not argue for a narrowing construction or severance below, this legislative history was not included in the Opening Brief.  Many of the sources cited herein are not readily available and are therefore provided as attachments.  Comprehensive overviews of the legislative history may be found in *Congress & Federal Anti-Riot Proposals, Pro-Con*, 47 Cong. Dig. 99 (1968) (Attachment A) (hereinafter *Anti-Riot Pro-Con*); and Zalman, Marvin. The Federal Anti-Riot Act and Political Crime: The Need for Criminal Law Theory, 20 *Villanova L. Rev.* 5-6 at 897 (Attachment B).

[3] H.R. 14765, 89th Cong. § 502 (Attachment C).

[4] Zalman at 911-12; *Anti-Riot Pro-Con* at 104-05.

[5] 112 Cong. Rec. 12652 at 17664 (Rep. Ryan).

When the 90th Congress took session, Representative Cramer again introduced an anti-riot bill as part of broader civil rights legislation, but a version with notable differences. This bill was eventually sent to the House Judiciary Committee, and then passed the house in July 1967 (hereinafter "1967 House Bill").[6] Debate over this bill was fierce, and included weeks of hearings and testimony before the Senate Judiciary Committee that carried into the fall of 1967.[7]

The record reflects a core ideological conflict over whether riots were caused by outside agitators, or by poverty and racial inequality. In the summer of 1967, President Johnson appointed a National Advisory Commission on Civil Disorders to study the causes of riots and how to prevent them.[8] Then in February of 1968, President Johnson called for enactment of a narrow federal legislation that would make it a felony "for any person to incite or organize a riot after having traveled in interstate commerce with the intention to do so," but failed to provide a draft bill to Congress at the same time.[9]

On February 29, 1968, the President's Commission issued its Report which attributed responsibility for the riots to racial division and poverty, implicating the role of "white society" and "white institutions" for creating and sustaining the

---

[6] H.R. 421, 90th Cong. § 2101 (Attachment D).
[7] *Anti-Riot Pro Con* at 99, 104-05.
[8] *Id.*
[9] *Id.* at 105.

divide.[10]  The Report recommended addressing the cause of the riots through multi-

billion dollar expenditures of Federal funds for urban redevelopment, expanded low-

cost housing, improved educational facilities, employment assistance, and public

welfare vision.[11]

Backlash was swift.  Instead of relying on the 1967 House Bill which had been

debated for months and awaited Senate action, Senators Thurmond and Lausche

introduced an expansive new anti-riot proposal on the floor of the Senate on March 4,

1968 (hereinafter, "Thurmond/Lausche Bill")[12] as an amendment to the fair housing

law being considered as part of the Civil Rights Act of 1968.  Editorials criticizing the

conclusions of the Commission's Report were simultaneously introduced into the

record, and numerous Senators agreed with the sentiment that "the report charges, in

essence, that all people except the rioters are responsible for the riots."[13]  By the time

the Attorney General introduced the Administration's proposed legislation on March

5, 1968 (hereinafter, "the Johnson Administration Bill"),[14] which was "substantially

milder"[15] it was too late to gain any momentum.  This was despite the Attorney

General's caution that "Federal legislation, if enacted, should be precisely drafted,

---

[10] Zalman at 912; Report of the National Advisory Commission on Civil Disorder
(1968) available at https://www.ncjrs.gov/pdffiles1/Digitization/8073NCJRS.pdf
(last accessed December 28, 2019).
[11] *Id.*
[12] H.R. 2516, 90th Cong., Amdt. No. 589 (Attachment E).
[13] 114 Cong. Rec. S2031 (March 4, 1968).
[14] Federal Anti-Riot Act of 1968, H.R. 15748, 90th Cong. (Attachment F).
[15] *Anti-Riot Pro-Con* at 105.

with a clear definition of all operative terms, so as to preserve scrupulously the constitutional rights of all Americans."[16]

Several Senators objected to the hasty process and the fact they were asked to vote for a bill that "comes right off the top of the head without quite knowing what its implications are and what it will do."[17]  But the Senate passed the bill on March 11, 1968, with minor amendments to the version first proposed a week earlier.

The bill was then sent back to the House of Representatives which balked at the open housing provisions and the bill languished until Dr. Martin Luther King, Jr. was assassinated on Thursday, April 4, 1968.[18]  Dr. King's funeral was on April 9, 1968, and the House voted to pass the bill the next day with the hope that the open housing protections would pacify increasing tensions.  President Johnson signed it on April 11, 1968.  The final law was substantially and deliberately broader than the 1966 Cramer Bill, the 1967 House Bill, and the Johnson Administration Bill that preceded it.

### C. The elements of the Act require a Commerce Event and "any other overt act" taken for the purpose of one of the Riot-Related Activities.

The Court should construe the elements of the Act as engaging in a Commerce Event, with the requisite Intent to engage in Riot-Related Activities, and then the actual or attempted performance of "any other overt act for any purpose" set out as a

---

[16] 114 Cong. Rec. S2231 (March 5, 1968).
[17] *Id.* at S2225.
[18] Zalman at 912; *Anti-Riot Pro-Con* at 128.

Riot-Related Activity.  Instead of interpreting "any other overt act for any purpose" as broadly as Congress drafted it, the Government suggests that the overt act required by the statute "must itself be a *fulfillment* of" one of the enumerated purposes and "not merely a *step toward* one" of them.  Appellee Br. at 27, quoting *United States v. Dellinger*, 472 F.2d 340, 361-62 (7th Cir. 1972).

The majority opinion in *Dellinger* reached this conclusion by looking at § 2101(b) which refers to "one or more of the overt acts described in subparagraph (A), (B), (C), or (D)."  This subparagraph of the statute amounts to a "senseless" rule of evidence.[19]  Because the purpose of the statute was to stop riots before they started by prosecuting outside agitators who intended to cause disruption, there was concern over how the requisite intent could be proven.  As originally proposed on the Senate floor, the section of the Act included a presumption that if the defendant engaged, or attempted to engage, in "one or more of the overt acts as described in subparagraph (A), (B), (C), or (D)" at "any time within fifteen days" after his travel or use of commerce, that he had engaged in the Commerce Event with the requisite intent.[20]

---

[19] Memorandum on H.R. 2516, 114 Cong. Rec. 9609-9611 (Attachment G) ("Sec. 2101(b) of the Senate version provides for a rule of evidence.  It is senseless.  The House version has no such provision.") This memorandum from the House Committee on the Judiciary examined the differences between the 1967 House Bill and the version of the Thurmond/Lausche Bill passed by the Senate.

[20] Attachment F.

Several Senators were concerned that this would improperly shift the burden of proof to the defendant and so the presumption language was removed.[21]

What remains is a rule of evidence. Engaging or attempted to engage in a Riot-Related Activity is *admissible* to show the defendant's intent. The fact that subparagraph (b) refers to the Prohibited Riot-Related Activities as "overt acts" does not mean that Congress's use of the phrase "any other overt act for any purpose" set out as a Riot-Related Activity in 2101(a) is reasonably susceptible to being rewritten as requiring a completed Riot-Related Activity. Such a reading requires deleting "other" and "for any purpose" from the text.

"Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) (internal quotation omitted). The Act's language on this point was broader than each of the prior drafts Congress considered and rejected. The 1967 House Bill required "thereafter performs or attempts to perform any overt act specified in paragraph (a)" not "any other overt act for any purpose." The 1966 Cramer Bill similarly said "any act" listed.[22] The Senate's conscious adoption of the broader "any other overt act" language confirms an intent to adopt a broader law

---

[21] 114 Cong. Rec. S2227-2230 (March 5, 1968).

[22] Attachment C. The Johnson Administration Bill (Attachment F) likewise required a completed rioting activity as discussed in section D *infra*.

which is consistent with the fact that Congress was concerned with creating a law enforcement tool to stop outsiders from sowing discord that would lay the groundwork for future riots.

### D. The Act does not require that the intent at the time of the Commerce Event be the same, or sufficiently similar, to the intent at the time of any other overt act

The original Thurmond/Lausche Bill created a presumption that "any overt act" within 15 days of the Commerce Event was proof of the requisite intent, which was *removed* from the Act. As a result, there is no link in the statute between the intent at the time of the Commerce Event, and the later actual or attempted "any overt act." Representative Celler, then Chairman of the House Judiciary Committee gave clear voice to the resulting problem with this construction in his opposition to the 1967 House bill that had presented the same issue:

> The bill violates the due process clause in providing that intent and act do not coincide. The bill makes it a crime for an individual to cross a State line or to go from a foreign country to a State or to mail a letter with a certain intent to incite or encourage a riot. Afterward, even though he no longer has that same intent, if he commits some overt act that could be construed as encouraging or promoting a riot or other public disturbance, he will have violated the law, although his crossing of the State line may have occurred months or even years before. This violates a basic requirement of criminal law that the intent and the criminal act must be contemporaneous. It is clear the bill does not require any specific intent at the time of the overt act – only at the time of the cross of the State line.[23]

---

[23] *Anti-Riot Pro-Con* at p.113.

The Government's suggestion that the Act is reasonably susceptible to a narrowed *mens rea* that matches the intent at the time of the Commerce Event to the later intent was specifically rejected by Congress when it passed on the more narrowly drawn Johnson Administration Bill which proposed:

> Whoever travels in interstate or foreign commerce with intent *to incite or organize* a riot, and who thereafter *incites or organizes* a riot…
>
> Whoever travels in interstate or foreign commerce with intent to *commit any act of violence* in furtherance of a riot, and who thereafter *commits or attempts to commit any act of violence* in furtherance of a riot…[24]

A comparison of these bills shows what language Congress would have used to require that the intent be sufficiently similar from the Commerce Event and the later Actual or Attempted Overt Act—language the Act lacks.

Finally, the Court should disregard the Government's suggestion that a jury instruction that "the prohibited act must also be committed with specific intent to riot" would save the statute. Appellee Br. 37. The Government has not cited any case that saves a facially overbroad statute through jury instructions—a theory that would entirely undo existing overbreadth and vagueness doctrines.

### E. This Court should give plain meaning to the words Congress actually used and not rewrite nearly all of the operative terms.

The Government proposes drastic rewriting of the Riot-Related Activities, as well as the Act's definition of riot, that is inconsistent with the avoidance canon.

---

[24] Johnson Administration Bill, Attachment F (emphasis added).

*1. The Riot-Related Activities*

A central question for this Court in construing the statute is how to interpret "inciting a riot." The Government suggests that "organize, promote, [and] encourage" should all be interpreted as "incite," and that "incite" should be construed as incitement under *Brandenburg v. Ohio*, 395 U.S. 444 (1969), to avoid constitutional problems. But this argument assumes the language is reasonably susceptible to a narrowing construction in the first place. It is not.

First, the statute sets forth incite, organize, promote, and encourage as different verbs. The basic surplusage canon of interpretation requires that every word and every provision in a statute be given effect and not be needlessly rendered duplicative or without consequence.[25] To defend against vagueness, the Government argues that encourage, organize, and promote have plain, ordinary meanings that are not ambiguous and that the "everyday meaning of such commonplace words" should be applied. Appellee Br. at 49. The everyday meanings of these "commonplace words" are simply not tied to imminent violence.

In *Stevens*, the Supreme Court considered a statute that banned "any . . . depiction" in which "a living animal is intentionally maimed, mutilated, tortured,

---

[25] *Williams* does not help the Government. *See* Appellee Br. at 29 citing *Williams*, 553 U.S. at 293. The fact that "advertises, promotes, presents, distributes, or solicits" was reasonably read to mean each word had a "transactional connotation" is very different than reading advertises, promote, present, and distribute to all mean the same thing as solicit, which is what the Government proposes here.

wounded, or killed." *Stevens*, 559 U.S. at 474 citing 18 U.S.C. § 48.  The Government

suggested while the terms "wounded" and "killed" did not necessarily on their own

indicate cruel conduct, that the terms should all be construed to require

"accompanying acts of cruelty."  Like here, the Government suggested this reading

was supported by "the commonsense canon of *noscitur a sociis*" and that ambiguous

terms like wounded and killed should take their meaning from the surrounding words.

*Id.*  However, the Supreme Court found that the phrase contained little ambiguity and

applied the ordinary meanings of "wounded" and "killed."  And found that "[n]othing

about that meaning requires cruelty."  *Id.*  This Court should likewise refuse to

eliminate 3 of the 7 Riot-Related Activities that Congress included in the Act.

The Government's argument that these words are all tied to violence relies on

the definitional provision of "incite a riot" from § 2101(b).  But that definition says

the terms "incite a riot" and "to organize, promote, encourage, participate in, or carry

on a riot" "include" but are "not limited to, urging or instigating other persons to

riot."  In other words, "urging or instigating" other persons to riot are just examples,

and not an exhaustive list, of the actions that count as organizing, promoting, and

encouraging a riot.

But the real statutory tell is the fact that urging and instigating other persons to

riot are expressly defined as *including* "advocacy of any act or acts of violence or

assertion of the rightness of, or the right to commit, any such act or acts."  The

Government asks the Court to "narrowly construe" this language by reading it in the

14

exact opposite way, falling on a characterization of the statute as "clumsy." Indeed, the statute is clumsy, but the legislative history reveals that Congress specifically added this phrase to clarify that while "mere advocacy" and "mere expression of belief" were not covered by the statute, advocating for acts of violence, and asserting the right to commit violence, were prohibited.

The 1967 House Bill said inciting "shall not mean the mere advocacy of ideas or the mere expression of belief," and nothing more.[26] The Johnson Administration Bill likewise stated that "incite or organize a riot . . . shall not mean the mere advocacy of ideas or the mere expression of belief."[27]

The fact that the 1967 House Bill had not defined "mere advocacy" or "mere expression of belief," led to criticism that those words were "so broad as to defy precise definition."[28] The Senate took care of that by explaining that this carve out *did not include* advocacy of acts of violence, because that counted as incitement. Specifically, the Thumond/Lausche Bill took this same language "shall not be deemed to mean the mere oral or written (1) advocacy or ideas or (2) expression of belief" and then added an exclusion to the exclusion: "not involving advocacy of any act or acts

---

[26] Attachment D.
[27] Attachment F.
[28] *Riot-Act Pro-Con* at 111 ("What is 'mere advocacy of ideas,' 'the mere expression of belief'?")

of violence or assertion of the rightness of, or the right to commit, any such act or acts."[29]

After the Senate passed the Act and it was sent back to the House for a vote, the House Judiciary Committee's memorandum analyzing the differences between the Act and the 1967 House Bill expressly stated:

> The Senate version like the House version, of the definition of the term "to incite a riot" states that such term does not mean the mere advocacy of ideas or expression of belief.  However, the Senate version makes clear that "expression of belief" does not involve "advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit any such act or acts," whereas the House version is silent on that particular aspect.[30]

More evidence for this understanding comes from the contemporaneous interpretation of the bill from Congress's own research arm for policy and legal analysis, the summary of the bill prepared by the Congressional Research Service (then known as the Legislative Reference Service):

> 'Inciting a riot' does not include mere oral or written advocacy of ideas or expression of belief, unless that expression contains advocacy of acts of violence.[31]

This reading is faithful to the text as well as Congress's intent to target speech that included advocacy of violence.

---

[29] Attachment E.

[30] Attachment G, *supra* n. 19.

[31] Danner, Herbert. The Civil Rights Act of 1968, Brief Summary of Basic Provisions, *Library of Congress Legislative Reference Service* (1968) (Attachment H).

16

This Court cannot apply a *narrowing* construction to *increase* the scope of the Act's exceptions clause. The Supreme Court similarly refused to give an "unrealistically broad reading" to the "exceptions clause" in *Stevens* to save it from overbreadth. 559 U.S. at 477-78. That statute exempted from prosecution "any depiction that has serious religious, political, scientific, educational, journalistic, historical, or artistic value." *Id.* Rewriting the "exceptions clause" of the Act to carve-out advocacy of violence would be as unrealistic as the Government's proposal to read anything with "serious….value" as excluding anything with even "scant social value" from prosecution. *Id.*

   *2. The definition of riot.*

   The definition of riot is also not reasonably susceptible to a narrow construction. Indeed, the definition further affirms Congress's intent to target advocacy of violence, without requiring intent, imminence or the likelihood of violence. The definition enacted by Congress was deliberately expansive as compared to the other bills considered in prior years. For example, the Johnson Administration Bill defined riot this way:

> A riot is a public disturbance, involving an assemblage of twenty or more persons, which by tumultuous and violent conduct creates grave danger of damage or injury to property and persons.[32]

---

[32] Attachment F.

The 1967 House Bill:

> A riot is a public disturbance, involving acts of violence by assemblages of three or more persons, which poses an immediate danger of damage or injury to property or persons.[33]

The adopted version was deliberately broader, introducing the "clear and present danger" requirement and included public disturbances where there were only threats of violence. 18 U.S.C. § 2102(a).

The inclusion of the "clear and present danger" requirements creates numerous constitutional problems. First, as the House Judiciary Committee explained, that the Act makes "the mistake of applying the 'clear and present danger' doctrine to the definition of a riot, rather than the definition of 'to incite a riot.'"[34] In other words, it is tied to the actions of the crowd, and not the words of the speaker as *Brandenburg* would require. The next problem is the test itself. The Government argues that the term "clear and present danger" is "anachronistic" but says it has nonetheless been "endorsed numerous times" (citing a case from 1941) and is therefore fine. Appellee Br. 33. That is correct—prior to *Brandenburg,* which replaced it with the intent, imminence and likelihood requirements because the "clear and present danger" test was problematic.

---

[33] Attachment D.
[34] Attachment G.

When Congress adopted the phrase "clear and present danger" it meant a "question of proximity and degree" and required a balancing of the "character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Landmark Comms., Inc. v. Virginia*, 435 U.S. 829, 842-443 (1978). And Congress intended for that term to cover exhortations to violence that occurred days or weeks before any riot broke out. This language is not reasonably susceptible to limitations requiring imminence, intent of the speaker, or likelihood of violence.

The expansion to include threats of violence further invalidates the definition and takes the Act further afield from *Brandenburg*. Without explaining why the text supports it, the Government again works backwards and recognizes that to save the Act, threats must mean "true threats" – "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Appellee Br. at 34 citing *Virginia v. Black*, 538 U.S. 343, 359 (2003). However, the Act does not support this narrowed construction for the reasons set forth above and because the riot need never even occur. Instead, the accused is subject to imprisonment if when he sent an email he intended to promote a public disturbance where someone else (not the accused) may make a threat, that, if acted upon, would result in damage to person or property. There is also no intent attached to the threat. Instead, there need only be a group of people where a threat is made, and where someone in that group has the ability to immediately execute it. Finally, the statute covers threats that (if acted upon) could

19

cause damage to *property* not just people.  The Government has not provided any cases that extend the "true threat" exception this far.[35]

**F. Without a basis in the text or congressional intent to draw a clear line, narrow construction is inappropriate, and the statute is overbroad under any level of scrutiny.**

Construed as written, and intended, the statute burdens speech.  The next question is whether it covers a sufficient amount of speech to support declaring the entire statute overbroad.  *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (overbreadth must be substantial judged in relation to plainly legitimate sweep of statute).  The level of scrutiny the Court applies to determine the "plainly legitimate sweep" of a regulation depends on the "purpose of which the regulation was adopted."  *Carandola v. Bason*, 303 F.3d 507, 512 (4th Cir. 2002).  "If . . . the regulation was adopted for a purpose unrelated to the suppression of expression—e.g., to regulate conduct, or the time, place, and manner in which expression may take place—a court must apply . . . intermediate scrutiny."  *Id.* at 512-13.  If instead, the regulation was adopted to burden expression, strict scrutiny applies.  *Id.* citing *Texas v. Johnson*, 491 U.S. 397 (1989).

The Act targets speech and expression.  Whether inchoate or actual, "rioting, in history and by nature, almost invariably occurs as an expression of political, social, or

---

[35] True threats "may cause serious emotional stress for the person threatened and those who care about that person, and a threat may lead to a violent confrontation." *Elonis v. United States*, 135 S. Ct. 2001, 2016 (2015).  They do not similarly impact property.

economic reactions, if not ideas." *Dellinger*, 472 F.2d at 359. Therefore, the

appropriate standard is strict scrutiny, also described as "the most exacting scrutiny."

*Boos v. Barry*, 485 U.S. 312, 321 (1988).

The Government, instead, argues for intermediate scrutiny, suggesting the Act

was "adopted for a purpose unrelated to the suppression of expression—e.g., to

regulate conduct" without providing any basis for this assertion. Appellee Br. at 39,

fn. 10. Under immediate scrutiny, a two-part analysis is required. "First, we must

determine whether the regulation materially advances an important or substantial

interest by redressing past harms or preventing future ones." *Satellite Broad. v. F.C.C.*

275 F.3d 337, 356 (4th Cir. 2001). These harms must be "real, not merely

conjectural" and the regulation must "alleviate these harms in a direct and material

way." *Id.* If this threshold test is satisfied, this Court must determine whether the

"regulation is narrowly tailored to serve that interest." *Id.*

Even under this lesser standard, the Act fails because the regulation does not

"materially advance an important or substantial interest," nor is it narrowly tailored to

serve that interest. In the 50 years since the Act was passed, *only one* prosecution

under the law has resulted in convictions not overturned on appeal. *See United States v.*

*Markiewicz*, 978 F.3d 786 (2d Cir. 1992). And the Act was far from critical in this

single successful prosecution because those defendants were also convicted of

numerous other offenses, like arson, theft, witness tampering, and perjury.

The other cases described by the Government as "[p]rosecutions under the Anti-Riot Act" were not actually prosecutions, or were ultimately unsuccessful. Appellee Br. at 23. Several cases cited concern search warrants or grand jury subpoenas that were grounded in the Act, but where no charges were ever brought under the law.[36] Then the Government mentions the "Gainesville Six" prosecution of anti-war protesters at the Republican National Convention in 1972—but all these defendants were acquitted.[37] The convictions of the Chicago Seven under the Act were overturned on appeal.[38] In *United States v. Hoffman*, 334 F. Supp. 504, 509 (D.D.C. 1971), charges under the Act were dismissed on the Government's motion.[39] That leaves one case where prosecution is pending, but the defendant is presently not competent to stand trial, and challenges to the constitutionality of the Act are forthcoming.[40]

---

[36] *See United States v. McNamara-Harvey*, No. 2:10-cr-219 (E.D. Penn.), *In re Application of Madison*, 687 F.Supp.2d 103 (E.D. NY 2009); *In re Shead*, 302 F. Supp. 560 (N.D. Cal. 1969).

[37] The prosecutions are referenced in *United States v. Camil*, 497 F.2d 225 n.3 (5th Cir. 1974) and *Beverly v. United States*, 468 F.2d 732, n.9 (5th Cir. 1972). *See also* https://www.nytimes.com/1973/09/01/archives/8-acquitted-in-gainesville-of-gop-convention-plot-8-are-acquitted.html (last accessed December 31, 2019).

[38] Open Br. at 5; *See Dellinger*, 472 F.2d 340; *United States v. Seale*, 461 F.2d 345 (7th Cir. 1972); *Nat'l Mobilization Comm. to End the War in Viet Nam v. Foran*, 411 F.2d 934 (7th Cir. 1969).

[39] Order of Dismissal, *United States v. Hoffman*, No. 973-71, (D.D.C. July 28, 1972).

[40] *United States v. Carter*, No. 17-cr-190 (E.D. Wis. Aug. 16, 2018). The Government did not list the case of *United States v. Ruffin*, No. 17-cr-129, ECF #47, (E.D. Wisc. Sept. 12, 2019), where the Government recently pled away charges under the Act after the magistrate judge recommended dismissal of the charges for failure to state an offense, reserving the constitutional issues.

The fact that the Anti-Riot Act does not materially advance an important or substantial interest is proved by the statute's lack of use alone. But in addition, the type of nationwide riots that motivated Congress in 1968 are no longer a present concern.[41] The only section of the statute the Government identifies as legitimate is prosecuting actual acts of violence at a riot—and the legislative history discussed below confirms that Congress intended to leave those prosecutions for the states. As a result, even under intermediate scrutiny, the law fails.

## II.     The Act is not severable, and even if it was, the Appellants' convictions must be vacated.

As an alternative to narrow construction, the Government asks this Court to sever and excise the impermissible portions from the Act and uphold the remainder. The Government has not identified the specific provisions it proposes could be severed from the Act and still leave a functional statute. But the focus of all of their arguments is that the Act is about local violent conduct. Presumably, the Government wants this Court to redraft the statute to only cover someone who travels with the intent to commit violent acts at a riot, and thereafter actually commits violent acts at a riot (with a tighter definition of riot). There are at least two reasons why the Court should not sever the statute in this manner. First, because the focus of

---

[41] *See Anti-Riot Pro-Con* at 100-101 for a table of 101 major riots between 1965 and 1967. While the Government's extraneous resort to the facts underlying this prosecution are not relevant to this facial challenge, they nonetheless provide a notable contrast between those riots and the Appellants' attendance at a lawfully-permitted rally.

the bill was on speech, expression, and outside agitators who stirred up local riots. And second, because Congress expressly recognized that violent conduct could, and should, be punished by the states.

### A. An unconstitutional provision cannot be severed if the remainder of the act would not have been enacted on its own.

"The inquiry into whether a statute is severable is essentially an inquiry into legislative intent." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999). The ultimate question is whether Congress "would have been satisfied with what remained" after the unconstitutional provisions are removed. *Champlin Rfg. Co. v. Corp. Comm'n of Okla.*, 286 U.S. 210, 235 (1932). Even if the parts that are leftover could function alone, the question is whether Congress would have "enacted those provisions independently of that which is invalid." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3161 (2010) ("FEF"). Thus, "[t]he more relevant inquiry in evaluating severability is whether the statute will function in a manner consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987).

To remove all the parts of the statute that cover speech, expression, and the events that lead up to a riot, this Court would not be performing the judicial function of striking unconstitutional provisions, but a legislative function. And it would be based on guesswork about which subset of the constitutional residue best serves Congress's policy goals which were explicitly tied to ending the civil rights riots of the

24

1960's. The result would be a new law that was never enacted by the political branches through the required means of bicameral passage and presentment to the President. *I.N.S. v. Chadha*, 462 U.S. 919, 951-59 (1983). "This would, to some extent, substitute the judicial for the legislative department of the [G]overnment," and in substance "make a new law, not … enforce an old one." *United States v. Reese*, 92 U.S. 214, 221 (1876). Such partial invalidation "may call for a 'far more serious invasion of the legislative domain' than [the Court] ought to undertake," especially "where linedrawing [would be] inherently complex." *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 330 (2006) (quoting *Nat'l Treasury,* 513 U.S. at 479, n.26). Given the "many different possible ways the legislature might respond" to the law's defects, courts should let Congress "rewrite those provisions." *Randall v. Sorrell*, 548 U.S. 230, 262 (2006).

None of the factors this Court must consider in evaluating severance support that conclusion that severance would result in a piece of remaining legislation that would operate in the "manner" intended by Congress: "the nature" of the stricken provision, *Alaska Airlines*, 480 U.S. at 685; the "historical context" of the legislation, *FEF*, 130 S. Ct. at 3162; and the impact of that provision on the "dominant aim of the whole statute," *R.R. Ret. Bd. v. Alton R.R. Co.*, 295 U.S. 330, 362 (1935).

## B. Excising the parts of the law that deal with speech and expression would result in a bill that focuses on local violent action, which is not what Congress intended to criminalize.

Congress wanted to target outside agitators, believed by many to be Communists, and to prevent those outsiders from coming into cities, stirring up discontent with speeches and rhetoric, and then leaving, with a crowd primed for a future riot in their wake.  And Congress intended to leave prosecution of local rioting violence to the states.

When Representative Cramer introduced the 1967 House Bill he said it was aimed at the "professional agitators" who "operate from States outside the jurisdiction of local law enforcement officials or who come into a jurisdiction, inflame the people therein to violence, and then leave the jurisdiction before the riot begins."[42]  He explained:

> He works up his audiences to a fever pitch.  He tells them they are downtrodden, that 'black power' is their salvation, that the Negroes must take the law into their own hands, that they must 'kill Whitey,' and that they must 'burn, baby, burn.' He calls for rebellion….He exhorts his audiences to say "To hell with the draft' . . . He then usually leaves that jurisdiction.  In his wake are thousands of Negroes whose blood is simmering—waiting for the instance certain to occur in any large city when a felon is arrested and shot.[43]

---

[42] *Anti-Riot Pro-Con* at 113-14.
[43] *Id.*

26

Outside "agitator" generally meant Communists, or civil rights leaders, sometimes both.[44] The Congressmen who debated the bill repeatedly expressed the belief that usually Communists were behind the riots.[45] Specific agitators were often named, including: Mario Savio, a Berkley student active with the Student Nonviolent Coordinating Committee (SNCC),[46] Stokeley Carmichael, a civil rights activist with the SNCC,[47] and Dr. Martin Luther King, Jr.[48]

In the weeks leading up to the introduction of the Thurmond/Lausche Bill, debate over other provisions of the 1968 Civil Rights Act and the causes of riots continued to place blame on Communist organizers and civil rights leaders.[49] And on

---

[44] *See, e.g., id.* at 118 (Rep. Watson) ("leaders of the mobs . . . are allied with the Communists"); *id.* at 120 (Rep. Schadeberg) ("Communists and other subversives and extremists . . ."); *id.* at 126 (Rep. Thompson) (citing evidence that the race riots are planned in advance by "trained and disciplined professionals . . . some of whom are either members of or officers in the Communist Party")

[45] *See, e.g., id.* at 17665 (Rep. Taylor) (Communists were "trying to take advantage of the civil rights movement" by going "from city to city and State to State to promote riots and violence and stir up race against race and class against class"); *id.* at 17653 (Rep. Harsha) ("known among members of the Federal Bureau of Investigation that certain Communist groups are responsible"); *id.* at 17643 (Rep. Edwards) ("Communists are involved in these riots")

[46] *Id.* at 17666 (Rep. Whitten).

[47] *Id.* at 17666 (Rep. Dickinson) ("It should go far in preventing a Stokely Carmichael from whipping his supporters into a frenzy")

[48] *Id.* at 17653 (Rep. Cramer) ("If Dr. Martin Luther King goes to that area for the purpose of peaceful demonstrations, it would not have any effect. If the intentions of the visit are actually for the purpose of the incitement of such civil disobedience, he would be guilty of a crime").

[49] 114 Cong. Rec. 1798 (Feb. 1, 1968) (Sen. Talmadge) ("Rap Brown and Stokely Carmichael, who go from city to city, day to day, fomenting strife and riots"); *see, e.g.,* 114 Cong. Rec. 3353 (Feb 19, 1968) (Sen. Eastland) (introducing the 1967 House Bill

April 10, 1967 when the House passed the 1968 Civil Rights Act, the same civil rights

activists were named as the types of individuals responsible for inciting riots with their

rhetoric.[50]

Debate on each iteration of antiriot legislation shows a focus on speech, and

the expression of ideas by these outsiders—not on the outsiders traveling *themselves* to

commit acts of violence.  In this vein, one Congressman suggested that the Vice

President was guilty of "encouraging" riots, along with the civil rights leaders:

> We have seen the sorry spectacle of hoodlums running wild in the major cities
> of the Nation, killing, burning, looting, and they have been excused by some of
> the highest officials of the land in the name of civil rights. Only a few days ago
> the mobs were encouraged by the Vice President of the United States to
> further violence and destruction. We have witnessed so-called civil rights
> leaders traveling from one end of this country to the other to incite and direct
> riots and the destruction of life and property. They piously preach nonviolence
> while at the same time they encourage violence...[51]

Other supporters of the law likewise cited the "group of malcontents and would be

revolutionaries . . . [t]hey preach and promote a nightmarish, nihilist tide of thought"

---

as part of the Internal Security Act of 1968 and describing riot provision as targeting
the "teaching or advocating the forceful, violent overthrow of government, and
against the activities of Communist organizers")

[50] April 10, 1968 House Record, at 9535 (Rep. Tuck) (King "openly advocated
nonviolence. . . [but] fomented discord and strife between the races" and "[v]iolence
followed in his wake wherever he went");  *id.* at 9574 (Rep. Fisher) (King plotted with
H. Rap Brown and Stokely Carmichael "the self-professed revolutionary who
globetrotted across the Communist world from Havana to Hanoi last year")

[51] 112 Cong. Rec. 17654 (Aug. 8, 1966) (Rep. Martin); *see also, e.g.,* 114 Cong. Rec. 4973
(March 4, 1968) (Rep. Holland) ("[p]lacing the sole blame for riots upon white people
is an encouragement toward future riots")

28

and described them as "professional agitators" who "spew forth a cant of hate and evil disobedience."[52]  "We see them on our television screens; we hear their rantings on radio, we see their pictures in the newspapers and national magazines."[53]  The Congressional record is filled with words like preaching, promoting, spewing forth, and ranting which all clearly focus on speech.  One Congressman summed it up directly: "preceding a riot, an outside agitator has appeared in a community to *harangue* an audience member concerning their grievances . . . often the *speeches* of these agitators have been criminally inflammatory . . . ."[54]

The other common thread was that the appropriate way to punish the actual violence—the riots themselves—was through state prosecution.  Concerns were voiced that "keeping of the public peace in our cities has always been traditionally a matter of local control"[55] and that it is not "proper for the Federal Government to assume responsibility for criminal law which is entirely intrastate when there is not a shred of evidence any one of the 50 states has had a breakdown or law and order or that there has been a reluctance on the part of the states to enforce laws against this condition."[56]  In response, proponents of the bill explained that this was not focused on the "acts of violence" themselves but the events that preceded the riots.

---

[52] *Anti-Riot Pro-Con* at 108.
[53] *Id.*
[54] *Anti-Riot Pro-Con* at 126 (emphasis added).
[55] 112 Cong. Rec. 17659 (Rep. Edwards)
[56] *Id.* at 17669 (Rep. Corman)

Representative Cramer described it "as a deterrent against agitators coming into the State or shipping materials into the State and thereby agitating within the State."[57] The House Committee on the Judiciary Majority Report explained of the 1967 House Bill that "riot control, riot prevention, and the punishment of rioters" generally rested with State and local police, but this bill focused on "those who agitate and incite such violence by the use of facilities in interstate commerce."[58] For this reason, the 1967 House Bill and the final Act contained an express carve-out to clarify that it was not taking jurisdiction away from the states.

Congress's consistent purpose in considering and passing anti-riot legislation was to try and help the states by stopping riots before they started.  The fact that the law—if severed to only cover those who commit acts of violence at a riot—would still achieve some of Congress's goals is not enough.  Half a loaf is not always better than none.  A statute that covers only travel with the intent to commit violent acts at a riot and actual commission of violent acts at a riot would simply not "function in a *manner* consistent with the intent of Congress," *Alaska Airlines,* 480 U.S. at 685.

### C. In any event, a severed statute would still require vacating the Appellants' convictions.

The Government asserts, without citation, that "although the indictment in this case invoked 18 U.S.C. § 2101 generally, on which Daley and Miselis's substantive

---

[57] *Id.* at 17652-53 (Rep. Cramer).
[58] *Anti-Riot Pro-Con* at 106.

charge is premised" their actions were a violation of only 18 U.S.C. § 2101(a)(3) and therefore would "not implicate the potentially problematic subparts of the statute." Appellee Br. at 43-44. This is wrong.

The Appellants pled guilty to one count of *conspiracy* to commit the Anti-Riot Act, which requires agreement to commit the offense, and any act to effect the object of the conspiracy. 18 U.S.C. § 371. And the conspiracy indicted was not limited to violating the Anti-Riot Act by traveling in interstate commerce with the intent to commit any act of violence in furtherance of a riot. Instead, the indictment alleged all parts of the statute. Not unusual, this single charging document alleged "alterative types of conduct in the conjunctive." *Vann*, 660 F.3d at 774. But this fact does not mean that the Appellants "'necessarily' pleaded guilty" to each subsection. *Id.* To the contrary, a plea of guilty admits only the elements of the charge necessary for a conviction. *Id.* citing *Malta-Espinoza v. Gonzales*, 478 F.3d 1080, 1082 n. 3 (9th Cir. 2007). As a result, the law assumes that the Appellants plea rests on the "least serious of the disjunctive statutory conduct, not the entirety of the conduct alleged in the conjunctive." *Id.* at 775.

Applied to this case, if the Court excised the purposes that included "incite, organize, promote" from the statute, under *Vann*, the presumption is that the Appellants pled guilty to conspire to commit the Anti-Riot Act in that manner. As a result, even with severance, the Appellants convictions must be vacated.

31

### III.   <u>The Act is unconstitutionally vague</u>

The Government's cursory response to the vagueness argument relies on the same narrowing constructions already discussed above.  While the Government dismisses the argument that a riot need never occur under the Act as irrelevant, it is particularly relevant when it comes to vagueness.  "[T]he common citizen" is not in fact "provided with many metrics by which to evaluate" (Appellee Br. at 47) whether the imagined riot that exists only his mind at the time of sending an email, printing a pamphlet, or making a cellphone call, might qualify.  For this reason, the fact that a few state rioting statutes have survived vagueness challenges is not persuasive.  Those laws punish *actual* rioting—not encouraging, organizing, and promoting riots, and certainly not using commerce with those intentions.  *See* Appellee Br. at 47-48. The Government's invented requirement that a jury must find that the defendant acted with the requisite riotous intent has no basis in the statute, or intent of Congress, and therefore also cannot save the Act from vagueness.

The Government then dismisses concerns over "incite," "organize," "encourage," "promote," being vague based on the same error of statutory interpretation discussed above—that the terms all mean "urging or instigating other persons to riot."  In fact, this is just one, *non-exclusive*, example of what they mean. Finally, the Government ironically suggests that the Court should use the "everyday meaning of such commonplace words" after previously arguing that the words

32

organize, encourage, and promote should all be rewritten to mean incite to pass constitutional muster.

The Act is unconstitutionally vague.

## CONCLUSION

The Act is incapable of a narrowing construction or severance consistent with this Court and the Supreme Court's precedents.  When the only thing standing between the accused and prison is the mercy of the prosecutor, the First Amendment steps in to protect them from the Government, since "it does not leave us at the mercy of noblesse oblige."  *Stevens*, 559 U.S. at 480.  This Court should declare the Act unconstitutional and vacate the Appellants' convictions.

Respectfully submitted this 3rd day of January 2020.

JUVAL O. SCOTT
Federal Public Defender
for the Western District of Virginia

 /s/ Lisa M. Lorish
LISA MARIE LORISH
Va. Bar No. 81465
Assistant Federal Public Defender
401 E. Market Street, Suite 106
Charlottesville, VA  22902
(434) 220-3380

*Counsel for Appellant Daley*

 /s/ Raymond C. Tarlton
RAYMOND C. TARLTON
TARLTON | POLK PLLC

33

3905 Haworth Drive, Suite 207 (27609)
PO Box 1386 (27602)
Raleigh, NC
(919) 948-6464

*Counsel for Appellant Miselis*

## CERTIFICATE OF COMPLIANCE

1. The brief of the appellant has been prepared using Microsoft Word 2013 software, Garamond font, 14 point proportional type size.

2. EXCLUSIVE of the table of contents, table of authorities, statement with respect to oral argument, any addendums, and the certificate of service, this brief contains 8,500 words as permitted by this Court's order dated December 30, 2019.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

1/3/2020 _____                   /s/ Lisa M. Lorish
Date                                  Lisa M. Lorish
                                      Assistant Federal Public Defender

## **CERTIFICATE OF SERVICE**

This is to certify that this Reply Brief of Appellant was electronically filed, and that true and correct copies were sent by first-class, postage-prepaid mail to:

Laura Rottenborn

Assistant United States Attorney

P.O. Box 1709

Roanoke, VA 24008

on this 3rd day of January, 2019

/s/ Lisa M. Lorish

Lisa M. Lorish

Assistant Federal Public Defender